IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 10, 2015 Session

IN RE **JOSEPH F.** ET AL.

Appeal from the Circuit Court for Grainger County
No. 8855     John D. McAfee, Judge

No. E2015-00733-COA-R3-PT –Filed March 31, 2016

This is a termination of parental rights case, focusing on the four minor children—Joseph F., Johnathon S., Sarah S., and Larry S. ("the Children")—of the respondent mother, Elizabeth F. ("Mother").  In January 2011, Mother voluntarily placed all four Children in the custody of Ernest S., the biological father of the younger three children.  Ernest S. passed away on June 27, 2011, while Mother was living in Oregon.  Upon motion of Ernest S.'s minister and family friend, Betty Shirley, the Grainger County Juvenile Court granted temporary custody of the Children to Ms. Shirley on June 28, 2011.  Ms. Shirley gave physical custody of the Children to the petitioners on July 8, 2011.  The petitioners filed a petition to terminate the parental rights of Mother and to adopt the Children on that same day.  Following a bench trial, the trial court found that statutory grounds existed to terminate the parental rights of Mother upon its finding by clear and convincing evidence that Mother (1) had abandoned the Children by willfully failing to provide financial support, (2) was guilty of severe abuse, and (3) was mentally incompetent to care for the Children.  The court further found by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. Mother has appealed.  We affirm the trial court's judgment terminating Mother's parental rights in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Ben H. Houston, II, Knoxville, Tennessee, for the appellant, Elizabeth F.

Dawn Coppock, Strawberry Plains, Tennessee, for the appellees, James and Shanamarie Harville.

**OPINION**

I. Factual and Procedural Background

Mother married Joseph A. F. in 1997 in Oregon. He is the legal father of the Children and the biological father of the eldest child, Joseph F., who was born in 1999. Mother separated from Joseph A. F. and began dating Ernest S. in 2001. Ernest S. was the biological father of the three younger children, Johnathon S., Sarah S., and Larry S., who were born in 2004, 2006, and 2007 respectively. Mother and Joseph A. F. did not divorce until 2013.

From 2001 to 2008, Mother and Ernest S. lived together in several different states, including Tennessee. Mother's relationship with Ernest S. was tumultuous and frequently punctuated with domestic abuse and crime. Following the demise of their relationship in 2008, Mother lived with various other individuals, two of whom were charged with abusing the Children. Mother had complaints filed against her with respective child welfare agencies in Tennessee, Alabama, and Oregon. Both Tennessee's and Alabama's child welfare agencies removed the Children from Mother at least once. The most recent child abuse investigation in Oregon during December 2010 led to supervision of the Children by Mother's parents. Mother then sent the Children to Tennessee in January 2011 to live with Ernest S. in order to, as the trial court subsequently found, thwart the child abuse investigation occurring in Oregon. Mother allowed the Children to live with Ernest S. despite her admissions that he had always been physically abusive toward her and that she had recently obtained an order of protection against him.

Ernest S. legitimated the three younger children and was granted custody of all four children by the Grainger County Juvenile Court on February 8, 2011. Mother joined Ernest S.'s petition for change of custody and consented to the court's grant of custody to Ernest S. Due to the fact that Ernest S. had recently been released from jail, he was receiving financial assistance and emotional support from a Methodist Church and its minister, Ms. Shirley. The petitioners in this action, James and Shanamarie Harville, had developed a relationship with Ernest S. prior to his release from jail, when Mr. Harville was employed as a jailer and Ernest S. was a trustee. Following his release, the Harvilles lived near Ernest S. and took part in the church's efforts to assist Ernest S. with raising the Children.

On June 27, 2011, Ernest S. died of sepsis and endocarditis, resulting from

2

intravenous drug abuse. Ms. Shirley filed a petition the following day in the Grainger County Juvenile Court, seeking temporary custody of the Children. Ms. Shirley alleged that Mother and all other blood relatives were unavailable to take the Children. Ms. Shirley further alleged that she and her husband had been acting as the "de facto grandparents" of the Children and that the Children were currently in her physical custody. The Juvenile Court granted temporary custody of the Children to Ms. Shirley on June 28, 2011. On July 5, 2011, Ms. Shirley sought an order of protection against Mother, asserting that Mother had threatened to "snatch" the Children.

At some point shortly after Ms. Shirley obtained custody of the Children, the Harvilles expressed their desire to Ms. Shirley to parent the Children. According to Ms. Harville, she and her husband had "fallen in love" with the Children and wanted to provide them with a forever home. On July 8, 2011, with Ms. Shirley's consent, the Children moved in with the Harvilles. On the same day, the Harvilles filed a petition in the Grainger County Circuit Court ("the trial court") seeking to terminate Mother's parental rights and adopt the Children. The Harvilles alleged grounds of abandonment by willful failure to support and abandonment by willful failure to visit. The Harvilles also sought to terminate the parental rights of Joseph A. F., who is not a party to this appeal. They filed an amended petition on August 26, 2011, to add another allegation of abandonment by failure to support against Mother, as well as allegations of severe abuse, persistence of conditions leading to removal, and mental incompetence. The trial court terminated Joseph A. F.'s parental rights by default judgment on April 24, 2012.

Following a bench trial, the trial court terminated Mother's parental rights on March 30, 2015, finding clear and convincing evidence of the statutory grounds of severe abuse, mental incompetence, and abandonment by willful failure to support. The court further found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children. The trial court also entered an order granting the Harvilles' request to adopt the Children. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

1. Whether the trial court lacked subject matter jurisdiction because the Harvilles lacked standing to file a petition to terminate parental rights.

2. Whether the trial court erred by terminating Mother's parental rights based upon the statutory ground of abandonment by willful failure to support during the four months preceding the July 8, 2011 petition.

3

3. Whether the trial court erred by terminating Mother's parental rights based upon the statutory ground of abandonment by willful failure to support during the four months preceding the August 26, 2012 petition.

4. Whether the trial court erred by terminating Mother's parental rights based upon the statutory ground of severe abuse.

5. Whether the trial court erred by terminating Mother's parental rights based upon the statutory ground of mental incompetence.

6. Whether the trial court erred by finding that termination of Mother's parental rights was in the Children's best interest.

7. Whether the trial court erred in entering an adoption decree when there was as yet no final order terminating Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *See In re Carrington H.*, ___ S.W.3d ___, ___, No. M2014-00453-SC-R11-PT, 2016 WL 819593 at *12 (Tenn. Jan. 29, 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, ___ S.W.3d at ___, 2016 WL 819593 at *12 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

4

The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky,* 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, ___ S.W.3d at ___-___, 2016 WL 819593 at *10-12. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

5

IV. Standing and Subject Matter Jurisdiction

Mother initially asserts that the trial court's order terminating her parental rights must be reversed because the Harvilles lacked standing to bring a termination petition, such that the trial court was without subject matter jurisdiction to entertain the action. The Harvilles contend that the issue of standing was never raised at the trial court level and should be deemed waived on appeal. Although the issue of standing can be waived in certain types of cases, *see In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013), our Supreme Court has ruled that "[w]hen a statute [such as the adoption statute] creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004). Therefore, standing is an issue that cannot be waived in a termination of parental rights/adoption case. *Id.*

With regard to the issue of standing in a termination of parental rights case, this Court has previously recognized:

> Both terminations of parental rights and adoptions are governed exclusively by statute in Tennessee. *Osborn v. Marr,* 127 S.W.3d 737, 739 (Tenn. 2004); *In re Shelby L.B.,* No. M2010-00879-COA-R9-PT, 2011 WL 1225567, at *5 (Tenn. Ct. App. Mar. 31, 2011). Tennessee Code Annotated section 36-1-113(b)(1) designates the parties who have standing to file a petition to terminate parental rights. That subsection provides, in pertinent part:
>
> > *The prospective adoptive parent or parents,* including extended family members caring for a related child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, or the department shall have standing to file a petition pursuant to this part or title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of the child . . . . *The prospective adoptive parents* . . . shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part.
>
> Tenn. Code Ann. 36-1-113(b)(1) (emphasis added). . . .
>
> The term "prospective adoptive parents" is defined in Tenn. Code Ann. § 36-1-102(41) as follows:

[A] non-agency person or persons who are seeking to adopt a child and who have made application with a licensed child-placing agency or licensed clinical social worker or the department for approval, or who have been *previously approved,* to receive a child for adoption, or who have received or who expect to receive a surrender of a child, or who have filed a petition for termination or for adoption;

(Emphasis added).

* * *

Further, as the trial court emphasized, [petitioners] cannot be prospective *adoptive* parents unless they have standing to file a petition for adoption. In the case of *In re Shelby L.B.,* 2011 WL 1225567, at \*10, this Court construed the legislative scheme for termination and adoption "as contemplating that a 'prospective adoptive parent' is one who not only harbors the intention or desire to adopt, but who also has the legal capacity or ability to do so." Tennessee Code Annotated section 36-1-115(b) imposes the following requirements for persons filing an adoption petition:

The petitioners must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6) [statute regarding surrender/parental consent] at the time the petition is filed, unless they are filing an intervening petition seeking to adopt the child.

Thus, a person or persons filing for adoption must have physical custody of the child or the right to receive physical custody pursuant to a valid surrender. Tenn. Code Ann. § 36-1-111(d)(6); *see In re Adoption of M.J.S.,* 44 S.W.3d 41, 49 (Tenn. Ct. App. 2000) (discussing adoption statutes).

*In re Sonya M.*, No. M2015-00064-COA-R3-PT, 2015 WL 4381567 at \*2-3 (Tenn. Ct. App. July 16, 2015).

Mother insists that the Harvilles do not meet the statutory criteria enumerated in Tennessee Code Annotated § 36-1-115 (2014) regarding persons eligible to file an adoption petition because they did not have "physical custody" or "the right to receive custody of the child . . . at the time the petition [was] filed." *See* Tenn. Code Ann. § 36-1-115(b). Mother contends that the Harvilles did not have "physical custody" of the

7

Children because custody of the Children had been granted to Ms. Shirley by the Grainger County Juvenile Court. Although the term "physical custody" is not defined in any part of the adoption statutory scheme, Mother argues that it means more than simply having physical possession of the Children and implies that some type of custody order has been entered.

The Harvilles assert that the adoption statutes repeatedly utilize the terms, "physical custody" and "legal custody," as two distinct and separate concepts. We agree. In certain sections of the statutory scheme governing adoption and termination, the language employed discusses "physical and/or legal custody," clearly demonstrating that these concepts are not synonymous. *See* Tenn. Code Ann. §§ 36-1-111(k)(2)(I), 36-1-112(e)(2)(B) (Supp. 2015) (emphasis added). Similarly, in other statutory sections concerning adoption and termination of parental rights, the language employed references legal and physical custody, again demonstrating by the utilization of both terms that these concepts are distinct. For instance, Tennessee Code Annotated § 36-1-111(r)(4)(B) provides that if there is a prior court order giving the right to legal and physical custody of a child to a person or entity, a parental surrender is invalid if it purports to give such rights to another person. Furthermore "no order . . . based upon that surrender . . . shall be effective to deprive the existing legal or physical custodians under the court's prior order of legal or physical custody of that child." Tenn. Code Ann. § 36-1-111(r)(4)(B). Tennessee Code Annotated § 36-1-113 (Supp. 2015) provides that the rights of someone who is not a legal parent or guardian of a child may be terminated when such person "has failed to manifest an ability and willingness to assume legal and physical custody of the child" or when "[p]lacing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child" (emphasis added).

Other statutory sections often utilize either the concept of "physical custody" or "legal custody," but not both. For example, Tennessee Code Annotated § 36-1-111(d)(6)(A)-(C), the statutory section addressing parental surrenders, employs language providing that a surrender shall not be valid "unless the person or persons or entity to whom or to which the child is surrendered . . . [h]as, at a minimum, physical custody of the child"; "[w]ill receive physical custody of the child from the surrendering parent or guardian within five (5) days of the surrender"; or "[h]as the right to receive physical custody of the child upon the child's release from a health care facility . . . ." (emphasis added). A subsequent subsection of that statute provides that "[i]f the person . . . to whom the child is surrendered . . . has physical custody . . . and if there has been full compliance with the other provisions of this section . . . the court may . . . enter an order giving the person . . . guardianship or partial guardianship of the child." *See* Tenn. Code Ann. § 36-1-111(r)(6)(C) (emphasis added). Similarly, Tennessee Code Annotated § 36-1-112 (e)(2)(A), the statutory section concerning revocations of surrender, provides:

> Unless they had received or maintained custody or guardianship of the child pursuant to a court order entered or pursuant to statutory authority prior to the execution of the surrender . . . the person or persons to whom the child was surrendered and who has <u>physical custody</u> of the child, shall, within five (5) days . . . return the child to the child's parents or guardian who executed and revoked the surrender . . . .

(Emphasis added.) These statutory sections intimate that the concept of physical custody is synonymous with having physical possession of the child inasmuch as they expressly provide for an order of custody to follow.

Similarly, Tennessee Code Annotated § 36-1-116(f)(3) (2014) provides that if there is <u>no</u> prior order of guardianship or legal custody, following receipt of a satisfactory home study, the court may issue an order of custody "if the petitioners have <u>physical custody</u> of the child . . . ." (emphasis added.) Tennessee Code Annotated § 36-1-118(b) (2014) states that if a child has been surrendered to adoptive parents but those parents have not filed a petition to adopt the child within thirty days of execution of the surrender, or have not obtained "an order of guardianship or an order of <u>legal custody</u> for the child," the court shall set a hearing to determine if the surrender should be revoked (emphasis added). This statutory section also provides:

> For purposes of this section, <u>legal custody</u> awarded by the court shall vest the legal custodian with the authority to provide the care and control of the child as set forth in § 37-1-140, but does not, by itself, without entry of an order of guardianship pursuant to this part, authorize the legal custodian to place the child for adoption or to consent to the adoption.

Tenn. Code Ann. § 36-1-118 (e)(8). Finally, the statutory scheme requires that the final order of adoption state the date the petitioners acquired <u>physical custody</u> and "from what person or agency <u>or</u> by which court order." *See* Tenn. Code Ann. § 36-1-120(a)(4) (2014) (emphasis added). Therefore, the use of the disjunctive word "or" suggests that physical custody can occur by virtue of an order of the court but that a court order is not required.

By contrast, Tennessee Code Annotated § 36-1-111, the statutory section addressing parental surrenders, provides that "where the child is in the <u>legal custody</u> of the department or a licensed child-placing agency, the surrender also may be filed in the chancery, circuit, or juvenile court or other court . . . ." *See* Tenn. Code Ann. § 36-1-111(q)(3) (emphasis added). Furthermore, a subsequent subsection of the same statute provides that if a child "has no legal custodian with authority to provide temporary care

9

for the child . . . the court shall give temporary <u>legal custody</u> . . . to the department or a licensed child-placing agency . . . ." *See* Tenn. Code Ann. § 36-1-111(v)(1)(C) (emphasis added). As used in this statute, the term "legal custody" denotes a distinction from physical possession, which is demonstrated by the fact that the Department of Children's Services often exercises legal custody or guardianship over children who are in the possession of foster parents or relatives. *See, e.g., In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616 at *1 (Tenn. Ct. App. Apr. 1, 2013) ("DCS placed the Children with the Foster Parents in February 2010, while DCS retained legal custody of the Children pursuant to court order."); *In re Amber M.S.*, No. M2010-00873-COA-R3-PT, 2010 WL 4941180 at *2 (Tenn. Ct. App. Nov. 30, 2010) ("[T]he girls were again placed in the legal custody of DCS and in the physical custody of separate foster families.").

> With regard to issues of statutory construction, our Supreme Court has explained:
>
> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.*, 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson*, 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga*, 172 Tenn. 505, 114 S.W.2d 441, 444 (1937).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009). Therefore, construing the language of the adoption and termination statutory scheme as written and so that its component parts "are consistent and reasonable," we conclude that the term "physical

custody" as utilized in the statutory sections would be synonymous with having physical possession of a child and would not require a court order or other judicial act.

Appellate decisions touching on the subject of physical custody with regard to construction of the adoption statutory scheme support the position that "physical custody" is akin to having physical possession of the child. For example, in the case of *In re Adoption of M.J.S.*, 44 S.W.3d 41, 49 (Tenn. Ct. App. 2000), this Court was asked to determine whether the child's grandparents had standing to file an adoption petition when the biological mother had placed the child in the care of a third party and subsequently executed a surrender designating the third party as the prospective adoptive parent. The third party filed a motion to dismiss the adoption petition filed by the grandparents because "[she] received physical custody of the child from the Mother on May 2, 1998" and "[the grandparents] did not have custody of the child at the time they filed their adoption petition." *Id*. at 48. This Court ruled that the trial court did not err in dismissing the petition filed by the grandparents because they did not have "physical custody." *Id*. at 54 ("it was undisputed that the Mother physically delivered the child to Langston . . . .") (emphasis added).

Similarly, in *In re S.E.J.*, No. W2008-01354-COA-R3-PT, 2009 WL 2058790 at *3 (Tenn. Ct. App. July 16, 2009), this Court held that the grandparents, with whom the child did not live, could not file a petition seeking to adopt the child. This Court explained that physical custody of the child was a prerequisite, noting that "the trial court's final order of adoption must state '[t]he date when the petitioners acquired physical custody of the child and from what person or agency or by which court order.'" *Id*. (quoting Tenn. Code Ann. § 36-1-120(a)(4)). Although this Court did not define "physical custody," it noted that the concept would require more than simply having monthly visitation with a child. *Id*. at *5.

Mother argues that we should adopt the definition of "custody" employed in the juvenile court statutory scheme, found at Tennessee Code Annotated § 37-1-102(b)(8) (2014). This statute defines "custody" as "control of actual physical care of the child and includes the right and responsibility to provide for the physical, mental, moral and emotional well-being of the child." The statute further provides that "'[c]ustody' does not exist by virtue of mere physical possession of the child." Tenn. Code Ann. § 37-1-102(b)(8). The statutory scheme found in Title 37 is distinct and separate from the statutes relating to adoptions and terminations, however, and instead concerns juvenile criminal proceedings, dependency and neglect actions, and child abuse actions. Furthermore, Tennessee Code Annotated § 37-1-102(b)(8) does not define the term, "physical custody," as that term is repeatedly used in the adoption statutes alongside the term, "legal custody," but instead simply addresses the concept of "custody" as a whole. Therefore, the statutory definition of "custody" contained in Tennessee Code Annotated §

11

37-1-102(b)(8) is inapplicable in the context of a termination or adoption proceeding.[1] Upon a careful review of the termination/adoption provisions found in Title 36 as a whole, along with applicable precedent, we conclude that "physical custody" means physical possession of a child, as granted by a parent, guardian, child-placing agency, or court.[2] We therefore conclude that because the Harvilles had physical possession and therefore physical custody of the Children at the time of the petition's filing, they have standing to seek termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-115.

## V. Abandonment by Nonpayment of Support

Mother asserts that the trial court erred by terminating her parental rights based on the ground of abandonment by nonpayment of child support. Tennessee Code Annotated § 36-1-113(g)(1) provides, as relevant to this action:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
>> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A)(i) (Supp. 2015) defines abandonment in relevant part as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child . . . .

Pursuant to the statute, the court must find that a parent's failure to visit or support was

---

[1] We further note that Title 37 also defines "legal custodian" as someone who has the right to, *inter alia*, physical custody of the child, which implies that even within Title 37, physical custody is a distinct concept from legal custody. *See* Tenn. Code Ann. § 37-1-140 (2014).

[2] Of course, "physical custody" as used in the statutory scheme does not include the unlawful taking of a child.

willful. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). As this Court has explained:

> The concept of "willfulness" is at the core of the statutory definition of abandonment. A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully" failed to visit or "willfully" failed to support the child for a period of four consecutive months.

*In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Failure to visit or support a child is willful when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864. This Court further elucidated:

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct.

*Id.* (citations omitted).

The four-month determinative period for purposes of determining abandonment by willful failure to pay support with regard to the first petition for termination of parental rights began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085 at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). Mother testified that she paid support of $150.00 cash to Ernest S. in February or March 2011, but she could not say for certain whether this payment was made during the relevant four-month period. She presented no corroborating proof. The trial court found her testimony in this regard not credible, thus finding that such payment was never made. As our Supreme Court has elucidated, trial courts are best situated to evaluate witness credibility, and "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Mother also argues that she was unaware of her duty to support the children because there was no order of support. However, Tennessee Code Annotated § 36-1-102(1)(H) provides that "[e]very parent who is eighteen (18) years of age or older is

13

presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Mother further argues that she was unable to pay support because she was unemployed and could not work due to her physical condition. As this Court has often recognized, a parent who "fails to support a child because he or she is financially unable to do so is not willfully failing to support the child." *In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008) (quoting *In re M.J.M., Jr.,* No. M2004-02377-COA-R3-PT, 2005 WL 873302 at *8 n.17 (Tenn. Ct. App. Apr. 14, 2005)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015).

Mother admitted, however, that she was capable of working and was not disabled. She maintained that she simply could not perform jobs that required her to stand for long periods because of osteoarthritis in her knees. Mother, age thirty-four at the time of trial, testified that she had worked in an adult foster home and a day care, and that she had performed housekeeping and landscaping services. As Mother admitted at trial, when asked during her 2012 deposition why she had not paid support for the children, she replied, "I don't see why. I'm going to get my kids back."

The trial court found in its March 30, 2015 order terminating Mother's parental rights that Mother "is able-bodied with job skills and alleges no impairment of the ability to work. Throughout the children's lives, including and during this four month period, [Mother] was content to make no or a minimal effort toward securing and maintaining employment." As this Court has previously explained, "trial courts are in the best position to make a determination regarding a parent's intent, based on the parent's demeanor and credibility as a witness." *See In re Mya E.*, No. M2012-02323-COA-R3PT, 2013 WL 2106839 at *7 (Tenn. Ct. App. May 13, 2013). Based on our thorough review of the record, we agree with the trial court that Mother's failure to support the Children was willful. We affirm the trial court's termination of Mother's parental rights based upon this statutory ground.

The trial court made a separate finding that Mother had failed to support the Children during the four months prior to the filing of an amended petition to terminate Mother's parental rights on August 27, 2012. We note, however, that no such petition appears in the record as the only amended petition appearing in the record was filed on August 26, 2011. We also note, however, that Mother's lack of payment of support and ability to work had not changed by the time of trial in January 2015.

## VI. Severe Child Abuse

Mother argues that the trial court erred in its determination that her parental rights should be terminated on the statutory ground of severe abuse. Tennessee Code Annotated § 36-1-113(g)(4) provides the following as an additional ground for parental

rights termination:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian.

Tennessee Code Annotated § 37-1-102(b)(21) (2014) defines severe child abuse as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
>
> > (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct; . . . .

With regard to the ground of severe child abuse, the trial court found:

> While the children were with [Mother], they were often hungry, dirty, and not dressed in sufficient or clean clothing. Their medical and educational needs often were unmet.
>
> [Mother's] home included drug use, drunkenness, domestic violence and criminal activity in the presence of her children.
>
> Dr. Christy Sorrell, the children's psychologist, diagnosed Joey [F.] with severe depression and found impairment of his ability to function in his environment. Johnathon, Sarah and Larry [S.] were diagnosed with reactive attachment disorder, and all the children suffer from post-traumatic stress disorder. Dr. Sorrell found that Sarah and Larry [S.'s] reactive attachment disorder caused severe impairment of their ability to function in

15

their environment. Dr. Sorrell testified that their conditions were caused by their mother's unstable and chaotic lifestyle, having multiple homes, household members, schools and caregivers, neglect and trauma.

This court agrees that the cause obviously centered around the mother here because she's the primary character here. It had to do with the environment, but the mother here was a participant in that environment throughout.

[Mother] both perpetrated and failed to protect her children from the abuse and neglect. This Court finds the grounds for termination of parental rights of severe abuse-psychological/emotional. T.C.A. § 36-1-113(g)(4) and § 37-1-102(b)(21)(B).

Following our thorough review of the record, we determine that the evidence supports the trial court's determination regarding the ground of severe child abuse. Mother admitted that she had made numerous bad choices during the time the Children were in her care. Mother's actions included frequently uprooting the Children and moving them from place to place, leaving the Children in the care of boyfriends who were abusive to her and/or the Children, allowing the Children to see her being arrested on at least two occasions, and failing to adequately provide for the Children's needs. Mother also admitted that the child welfare agencies in three states had investigated her living environments and found deficiencies in her care of the Children. She further admitted that at least one child had been severely physically abused by someone to whom Mother entrusted the child's care. The evidence clearly established that the Children were exposed to a long-standing pattern of neglect while in Mother's custody.

Dr. Sorrell, a licensed psychologist who worked with the Children for over a year after they began living with the Harvilles, diagnosed the oldest child, Joseph F., with major depressive disorder or severe depression. Dr. Sorrell testified that Joseph F.'s condition was chronic and that he would struggle with it throughout his life. Dr. Sorrell opined that Joseph F.'s severe depression was caused by the frequent changes in residences, schools, and caregivers, coupled with his ongoing exposure to domestic violence, all of which he experienced while in Mother's care. According to Dr. Sorrell, Joseph F. reported witnessing Mother being hit or abused frequently, police officers in the house, horrific living conditions, and other traumatic events. Dr. Sorrell likewise diagnosed the three younger children with reactive attachment disorder and post-traumatic stress disorder. Dr. Sorrell testified that the Children's psychological issues were caused by the neglect, abuse, and trauma they experienced or witnessed while residing with Mother. Furthermore, Dr. Sorrell opined that the Children would struggle with these issues for the rest of their lives.

Dr. Sorrell's testimony presented clear and convincing evidence that the Children suffered from either severe depression and/or severe impairment of their ability to function due to the abuse and neglect they experienced while in the custody of Mother. *See* Tenn. Code Ann. § 37-1-102(b)(21) (defining severe child abuse as "brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce . . . severe depression . . . or severe impairment of the child's ability to function adequately in the child's environment."). We therefore conclude that the trial court properly terminated Mother's parental rights based on the statutory ground of severe abuse.

## VII. Mental Incompetence

Mother also argues that the trial court erred by terminating her parental rights based upon the statutory ground of mental incompetence. Tennessee Code Annotated § 36-1-113(g)(8) provides as a ground for termination:

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

Mother insists that the trial court based its determination in this regard solely on the testimony of Dr. Sorrell, who only had two interactions with Mother before opining that she had a chronic personality disorder. Mother further asserts that Dr. Sorrell categorized Mother's IQ as below average even though Dr. Sorrell never conducted an IQ assessment. In support of her argument, Mother asserts that she works part-time at a daycare center, has received a glowing recommendation from her employer, is in a stable relationship with her boyfriend, and cares for her boyfriend's thirteen-year-old daughter on a daily basis. She further notes her father's testimony that she had improved her life.

As the Harvilles posit, although Dr. Sorrell only met with Mother on two occasions, Mother's personality disorder diagnosis was not based simply on those interactions. We agree. Rather, Dr. Sorrell relied upon the report of Dr. Adlin, a clinical psychologist employed by Mother. Dr. Adlin conducted testing of Mother that resulted in the diagnosis of a personality disorder, and Dr. Sorrell concurred in that diagnosis. Dr. Sorrell opined that Mother tended to be impulsive and immature, seeking immediate gratification of her wishes without apparent concern for the consequences or welfare of others. Dr. Sorrell testified that Mother exhibited a history of chronic poor judgment and allowing abuse by her partners. Dr. Sorrell opined that Mother was hedonistic, manipulative, self-centered, and incapable of properly caring for the Children because she would be unable to put their needs before her own. Dr. Sorrell opined that Mother's prognosis for change was poor because she always blamed others for her problems. Mother presented no countervailing expert proof regarding her mental status. In fact, Mother admitted at trial that she did not think she had a mental problem that would benefit from treatment.

Furthermore, as the trial court found:

[T]he court gives credibility to Dr. Sorrell because the Court observed [Mother] in the courtroom. The court observed her testimony, her inconsistencies, and her behavior. Dr. Sorrell's findings are consistent "to a T" with what has been seen by this court.

[Mother] testified that she does not have a psychological problem in need of treatment. This mindset further decreases her chance of successful treatment.

[Mother] has demonstrated precisely the pattern of behavior predicted by Dr. Adlin and Dr. Sorrell's diagnoses. [Mother] does not have the ability to identify and create a safe, stable and nurturing environment for her children and lacks the insight necessary to see and attempt to rectify

18

the shortcoming. While her lack of insight may prevent her from recognizing the detrimental effects of her poor parenting, it does not make her behavior less damaging to her children.

This Court finds that [Mother] is incompetent to adequately provide for the further care and supervision of the children because her mental condition is presently so impaired and is so likely to remain so that it is unlikely that [Mother] will be able to assume or resume the care of and responsibility for the children in the near future.

Based upon our careful review of the record, we conclude that the evidence supports the trial court's determination that Mother suffered from mental incompetence, as defined in Tennessee Code Annotated § 36-1-113(g)(8). The evidence demonstrated that Mother was "incompetent to adequately provide for the further care and supervision" of the Children because Mother's "mental condition is presently so impaired and is so likely to remain so that it is unlikely that [she] will be able to assume or resume the care of and responsibility for the [Children] in the near future." *See* Tenn. Code Ann. § 36-1-113(g)(8). As such, the trial court properly terminated Mother's parental rights based upon this statutory ground.

## VIII. Best Interest of the Children

Finally, Mother contends that the trial court erred by finding clear and convincing evidence that termination of her parental rights was in the Children's best interest. When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the Children's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877.

Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *In re Audrey S.*, 182 S.W.3d at 878. Further, the best interest of a child must be determined from the child's perspective and not the parent's. *White*, 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Mother insists that the trial court erred in determining that the best interest of the Children would be served by terminating her parental rights because the proof showed that she is in a stable relationship, is caring for her boyfriend's daughter, and has made positive changes in her life. The Harvilles assert that Mother's boyfriend is a felon, that

she has often been the victim of domestic violence and has allowed other boyfriends to be violent to the Children, and that she has demonstrated a pattern of neglect of the Children throughout their lives.

The trial court made detailed findings regarding the best interest analysis, addressing each factor in turn. With regard to the first factor, the trial court found that Mother was residing with a man to whom she was not married, and upon whom she depended for support because she was unemployed. The court noted that Mother's boyfriend had a lengthy criminal history. The court also found that Mother continued to deny her role in the past neglect of her Children. The court thus found that Mother had not made a lasting adjustment of circumstance as to make it safe for the Children to be with her and that a lasting adjustment did not appear to be reasonably possible. With regard to factor two, the court found that there was no requirement of reasonable efforts by a social service agency due to the fact that this action was a private adoption.

Regarding the third factor of visitation, the court found that Mother chose not to visit the Children from January 2011 to June 27, 2011, when the Children were in the custody of Ernest S. The court noted Mother's admissions that her parents were long-haul truck drivers who frequently traveled between Tennessee and Oregon and that she could have traveled with them if she had so wanted. Factor number four concerns whether Mother had a meaningful relationship with the Children, and the court found that she did not. The court referred to Dr. Sorrell's observation that the Children did not grieve for Mother since they had been separated from her.

Factor number five addresses the effect a change of caretakers and physical environment would have upon the Children. The court found that, according to Dr. Sorrell, stability was especially important for the Children due to their mental health diagnoses. Therefore, based upon the wealth of testimony regarding the strong bond between the Children and the Harvilles, the court found that a change of caretakers and physical environment would be "detrimental to the children's delicate recovery." With regard to factor six, the trial court noted that there were numerous reports of abuse when the Children were in Mother's care, beginning when Joseph F. was just a toddler and continuing throughout the period the Children lived with Mother. The court found that the record was "full of evidence of neglect" by Mother and also that there were at least two criminal child abuse actions filed against Mother's paramours.

Factor number seven concerns whether Mother's home was healthy and safe. The court found that while there were serious concerns regarding drugs, alcohol, and criminal activity in Mother's home in the past, the only current issue was Mother's poor judgment and psychological impairment. The court found that the present criminal activity was Mother's procurement of food stamps and health insurance through fraudulent

applications. With regard to factor eight, the court determined that its finding of mental incompetence demonstrated that Mother's mental and/or emotional status would be detrimental to the Children. Regarding factor nine, the trial court found that no support had been paid by Mother.

The trial court continued its analysis by stating:

> This Court also finds that expert evidence indicates that the children in this case have a heightened need for stability and very low tolerance for disruption of emotional bonds. Evidence clearly indicates that the children are bonded with one another and with the Petitioners. The Petitioners have provided a very stable and wholesome home for these children. The Petitioners demonstrate genuine and appropriate parental love for the children and the children are healing and thriving in their care. The Petitioners are equipped to identify and secure any intervention the children need to maximize their potential.

We agree with the trial court's findings regarding best interest and determine that the evidence does not preponderate against those findings. Mother has failed to demonstrate a lasting change in her circumstances and in the long-standing patterns of poor life choices, which have affected the Children in a negative way. Mother's testimony demonstrated that she did not appreciate the serious nature of her past or current shortcomings as a parent. Meanwhile, the evidence was overwhelming that the Children were happy and thriving with the Harvilles and that they expressed no desire to be reunited with Mother. The evidence was clear that a change of caretakers at this point would be extremely detrimental to the Children. For all of the foregoing reasons, we conclude that the trial court properly found by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children.

## IX. Entry of Final Order

Finally, Mother asserts that the trial court erred by entering an order of adoption when there was no final order terminating her parental rights. Essentially, Mother argues that since the order terminating her rights was entered on the same day as the adoption order, and the appeal period on the termination order had not expired, that order was not yet final.

The Harvilles posit that courts often enter termination and adoption orders on the same day and that there is no harm in doing so, especially where, as here, Mother did not request a stay and her counsel preapproved the termination order, which stated that the adoption would proceed immediately. The parties have referenced no authority that

reversible error exists relative to a trial court's entry of the order granting adoption concomitant with entry of the order terminating parental rights. *See* Tenn. Code Ann. § 36-1-120 (providing that final order of adoption must demonstrate that termination of parental rights has occurred). We suggest, however, that a better practice would be to allow any appeal of the termination order to become final before proceeding with entry of the adoption in order to avoid the risk that the adoption order might be set aside if the termination is reversed on appeal.

## X.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment terminating Mother's parental rights in all respects. Costs on appeal are assessed to the appellant, Elizabeth F. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE