FILED

03/21/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 2, 2018

## IN RE: VERONICA T., ET AL.

**Appeal from the Juvenile Court for Rutherford County**
**No. TC2760    Donna Scott Davenport, Judge**

_____

### No. M2017-00726-COA-R3-PT

_____

This appeal involves the termination of a mother's parental rights to her four minor children. The trial court found by clear and convincing evidence that four statutory grounds for termination had been proven and that termination is in the best interest of the children. We reverse with respect to two of the grounds for termination but otherwise affirm the trial court's order terminating the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in part, Affirmed in part and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and RICHARD H. DINKINS, JJ., joined.

Carl Richard Moore, Murfreesboro, Tennessee, for the appellant, Cassie T.

Herbert H. Slatery III, Attorney General and Reporter, Brian Allen Pierce, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### I. FACTS & PROCEDURAL HISTORY[1]

Cassie T. ("Mother") has four children who were born between 2003 and 2013. The Tennessee Department of Children's Services ("DCS") became involved with Mother and her children in July 2014 due to Mother's incarceration. Mother pleaded guilty to theft over $10,000 in connection with a stolen vehicle and received a three-year

_____

[1]In parental termination cases, it is this Court's policy to redact names in order to protect the identity of the children.

sentence. She also pleaded guilty to possession or casual exchange of a controlled substance (cocaine) and received a ten-day sentence. Through DCS, Mother agreed to an immediate protection agreement allowing a relative to care for the children. Mother consented to a drug screen and tested positive for cocaine and oxycodone. After serving about two weeks in jail, Mother was released on supervised probation for the remainder of her sentence. DCS prepared a non-custodial permanency plan with tasks for Mother to complete, such as consenting to random drug screens, obtaining stable housing, and participating in an alcohol and drug assessment and following its recommendations.

On August 1, 2014, the relative who was caring for the children informed DCS that she could no longer care for them. A second immediate protection agreement was executed, and the children were placed with another relative until mid-September 2014, when this relative likewise informed DCS that she could no longer care for them. Mother agreed to a third immediate protection agreement allowing the children to live with a third relative, Mother's sister, on September 16, 2014. The agreement provided that Mother would have no contact with the children until she passed two drug screens. Around this time, Mother committed another criminal offense, and she pleaded guilty to simple possession of a controlled substance. She also pleaded guilty to theft under $500. She was incarcerated for another eight-day period at some point around this timeframe.

On October 14, 2014, DCS filed a petition to have the children adjudicated dependent and neglected with custody awarded to Mother's sister. At a hearing on November 6, 2014, Mother's sister testified that she could not continue caring for the children due to limited finances. That same day, the juvenile court awarded temporary custody to DCS pending an adjudicatory hearing. The juvenile court found probable cause that the children were dependent and neglected due to Mother's positive drug screen for cocaine and oxycodone, her failure to cooperate with DCS or pass additional drug screens, and her "apparent lack of concern for the children as evidenced by her failure to visit and her failure to inquire as to the welfare of the children."

On November 21, 2014, the four children were placed in a foster home. On the same date, DCS formulated a permanency plan for Mother with a goal of returning the children to her. The plan provided that Mother was required to pass random drug screens and demonstrate sobriety before she could begin visits with the children. The plan also required Mother to follow the rules for visitation once it began, follow the rules of her probation, avoid additional criminal charges, provide proof of a legal source of income and stable housing, cooperate with home visits, develop a budget and a transportation plan and child care plan for the children, participate in a clinical drug and alcohol assessment and follow its recommendations, complete parenting classes, and pass random drug screens and pill counts within three hours of any request. Mother participated by phone, and a DCS caseworker discussed the details of the plan with her. While on the

phone, Mother admitted to being under the influence of oxycodone and another drug, allegedly because of fibromyalgia, but she did not produce any prescription to her caseworker.

Despite the entry of the permanency plan containing these responsibilities, Mother continued to use drugs and incur new criminal charges. She admittedly used cocaine weekly and abused oxycodone. She was unemployed and resided with different relatives. Mother was incarcerated again from early January 2015 until February 14, 2015. A few weeks after her release, she returned to jail in March or April of 2015 and remained there for about four months. While Mother was incarcerated, the juvenile court held the final hearing in the dependency and neglect case on April 13, 2015, and entered an adjudicatory order providing that custody of the children would remain with DCS. The court found that the children were dependent and neglected as children who were "without a parent" due to abandonment, whose parent was unfit to care for them due to "immorality or depravity" because of her abuse of cocaine and oxycodone, and who suffered from "neglect" due to drug exposure. *See* Tenn. Code Ann. § 37-1-102(b)(13)(A), (B), (G). Also during this term of incarceration, a revised permanency plan was developed on May 6, 2015, with the same responsibilities for Mother but an alternative goal of adoption. A caseworker from DCS visited Mother in jail and went over the plan with her. Mother also signed the criteria for terminating parental rights. Mother completed an alcohol and drug assessment with a parenting component while in jail in July 2015. The assessment recommended intensive outpatient treatment, random drug screens, and parenting classes. However, Mother had already informed her caseworker that she did not want prison services for AA or parenting.

Upon her release in early August 2015, Mother was required to participate in a drug rehabilitation program as a condition of her probation. For a couple of months, she lived at a halfway house funded through the drug court program and was employed at a restaurant. Mother had not seen the children since they were placed with relatives a year earlier, and she wrote a few letters to the oldest child. While at the halfway house, Mother failed a drug screen and tested positive for cocaine. She did not complete the treatment program at the halfway house and left in October to live with another relative. According to Mother's testimony, she was incarcerated two more times at some point during this general timeframe for "two ten-day sanctions" periods, apparently for violating her probation. She would later admit to her caseworker that she was using heroin and cocaine during this period after she left the halfway house.

Mother was arrested again on November 2, 2015. This time, she was charged with "possession with intent" and tampering with evidence, and she was sent to a women's prison. On November 19, 2015, DCS filed a petition to terminate Mother's parental rights based on four statutory grounds – abandonment by failure to provide a suitable

3

home; abandonment by an incarcerated parent exhibiting wanton disregard for the children's welfare; substantial noncompliance with a permanency plan; and persistent conditions. *See* Tenn. Code Ann. § 36-1-113(g)(1)-(3). When the petition was filed, the children had been residing in their foster home for two days shy of one year with no contact from Mother aside from a few letters. Mother remained incarcerated at the women's prison throughout most of the termination proceeding due to her November 2 arrest. The trial court appointed a guardian ad litem and appointed counsel for Mother.

The trial court conducted a bench trial over the course of seven days, beginning on June 14, 2016, and continuing over the next few months. When the trial began, Mother remained incarcerated, but by the time the trial ended, she had been released on parole and was residing at a halfway house. The trial court heard testimony from Mother, her husband, three DCS caseworkers, the oldest child, the foster mother, Mother's probation officer, and representatives from two halfway houses. Ultimately, the trial court entered a lengthy written order in which it found by clear and convincing evidence that all four grounds for termination had been proven and that termination was in the best interest of the children. Mother timely filed a notice of appeal.[2]

## II. ISSUES PRESENTED

On appeal, Mother presents very narrow issues regarding each of the four grounds for termination, and she does not raise any issue regarding the best interest analysis. Still, the Tennessee Supreme Court has held that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

After conducting this review, we conclude that the trial court's findings as to two grounds for termination must be reversed, but we affirm the trial court's findings as to the other two grounds and the best interest of the children.

## III. STANDARD OF REVIEW

In Tennessee, proceedings to terminate parental rights are governed by statute. *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of a biological parent's parental rights must prove two elements. *Id.* at 552.

---

[2]The order also terminated the parental rights of one father and one possible father, but neither filed a notice of appeal.

First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

Because of the constitutional dimension of the rights at stake in a termination proceeding, persons seeking to terminate parental rights must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (quoting *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

Due to this heightened burden of proof in parental termination cases, on appeal we adapt our customary standard of review set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review each of the trial court's factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Two Inapplicable Grounds

On appeal, Mother argues that the two statutory grounds for termination known as persistent conditions and abandonment by failure to establish a suitable home are not applicable to her factual situation. We agree. "The grounds of abandonment by failure to establish a suitable home and persistence of conditions are predicated on the child being removed from the home of the person whose parental rights are sought to be terminated."

*In re Promise A.*, No. M2015-02144-COA-R3-PT, 2017 WL 1032741, at *8 (Tenn. Ct. App. Mar. 16, 2017) (*no perm. app. filed*). Specifically, the ground of abandonment by failure to establish a suitable home applies only when:

> The child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(ii). The statutory ground of persistent conditions contains a similar threshold requirement. "An essential prerequisite to establishing persistence of conditions is evidence of a 'prior court order removing the child from the parent's home . . . based on a judicial finding of dependency, neglect or abuse.'" *In re Aiden R.*, No. E2015-01799-COA-R3-PT, 2016 WL 3564313, at *9 (Tenn. Ct. App. June 23, 2016) (*no perm. app. filed*) (quoting *In re Audrey S.*, 182 S.W.3d at 874); *see also In re Alleyanna C.*, No. E2014-02343-COA-R3-PT, 2015 WL 4773313, at *14 (Tenn. Ct. App. Aug. 10, 2015) (describing the necessary court order of removal as "the threshold consideration for this statutory ground"). Notably, "the child must not only have been adjudicated dependent and neglected, but he or she must also have been removed from the defendant parent's home." *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794, at *5 (Tenn. Ct. App. Sept. 19, 2016) (*no perm. app. filed*); *see, e.g., In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at *8 (Tenn. Ct. App. Aug. 30, 2017) ("the statutory ground of persistence of conditions is not applicable . . . as the record contains no evidence to suggest that the Children were residing in Father's home at the time of their removal").

On appeal, Mother argues that these two grounds do not apply because the children were removed from her home in July 2014 and placed with relatives when she voluntarily signed an immediate protection agreement. Although a dependency and neglect action was filed later, after three relative placements, the children were then removed from the third relative placement home and placed in the custody of DCS. In its posture as appellee on appeal, DCS states in its brief that it "does not defend" these two grounds for termination.

We find insufficient evidence to establish the ground of persistent conditions "given the absence of a prior order removing the children from the parent['s] home based on a judicial finding of dependency, neglect, or abuse." *In re Aiden R.*, 2016 WL 3564313, at *10. We likewise find the ground of abandonment by failure to establish a suitable home inapplicable because the children were not "removed from the home of the parent . . . as the result of a petition filed in the juvenile court" in which they were found

dependent and neglected. Tenn. Code Ann. § 36-1-102(1)(A)(ii); *see In re Promise A.*, 2017 WL 1032741, at *8 (finding these two grounds inapplicable when the children "lived in a different home" from the parent at the time they were removed and placed in foster care); *In re Navada N.*, 498 S.W.3d 579, 597 (Tenn. Ct. App. 2016) (reversing termination where an order adjudicated the child dependent and neglected and stripped the father of his legal custody, but nothing in the order indicated that the child was "actually residing in the home" with the father to show removal from his home); *In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *10 (Tenn. Ct. App. June 23, 2015) (explaining that neither of these grounds is applicable when the child was not removed from the home of the parent whose rights are at issue).

### B. *Abandonment by an Incarcerated Parent*

The next ground at issue on appeal is abandonment by an incarcerated parent. For purposes of terminating parental rights, there are five alternative definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A)(i)-(v). Subsection (iv) provides "mechanisms by which abandonment may be proven when the parent is incarcerated at or shortly before the filing of the termination petition." *In re Navada N.*, 498 S.W.3d at 597. In this context, abandonment occurs when the parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). Exhibiting a "wanton disregard" for the child's welfare prior to incarceration establishes a ground for termination of parental rights. *Id.*

Thirteen years ago, in *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005), this Court discussed this ground for termination as follows:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. [citation omitted] However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the

7

welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

This Court has consistently held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

Clearly, then, Mother's repeated incarceration, criminal behavior, substance abuse, and failure to support her children throughout this case exhibited a wanton disregard for the welfare of her children according to the caselaw cited above. On appeal, Mother acknowledges this caselaw regarding wanton disregard for a child's welfare but argues that it was wrongly decided. Her brief states:

The Court below made specific findings of fact with respect to Mother's criminal convictions, drug abuse, and failure to visit, [] and Mother does not contest those findings of fact. Rather, Mother asserts that the definition of 'wanton disregard' as described in the Audrey S. opinion and relied upon by the Juvenile Court, is incorrect.

Mother argues that Tennessee cases regarding "wanton disregard" have failed to recognize the plain and ordinary meaning of "wanton." Mother relies on a definition from *Black's Law Dictionary* stating that "wanton" means "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." She also cites the following language from *Tennessee Pattern Jury Instructions*:

Willful or wanton misconduct is intentional wrongful conduct, done either with knowledge that serious injury to another will probably result, or with a wanton and reckless disregard of the possible results. It does not require an intent to injure or harm the plaintiff individually.

8 Tenn. Prac. Pattern Jury Instr. T.P.I. - Civil 3.30 (2017 ed.). Based on these definitions, Mother argues that the term "wanton" requires conduct that "actually posed a risk of harm" to the child. Mother claims there was no evidence in this case that her criminal

8

activity and substance abuse posed any danger to her children because she had no contact with the children whatsoever during that two and a half year period. Mother asks this Court to "overrule the definition of wanton disregard described in In re: Audrey S., restate a new definition consistent with the plain language of the statute, and reverse this ground for termination consistent with that definition."

We are not persuaded. At the outset, this Court rejected a similar argument in *In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *7 (Tenn. Ct. App. Oct. 3, 2017), *perm. app. denied* (Tenn. Jan. 5, 2018), where parents argued that *In re Audrey S.* was incorrectly decided. Like Mother, the parents claimed that they did not exhibit wanton disregard for their children's welfare because "the children were not in their care or custody when they engaged in criminal behavior and, thus, their behavior did not put the children in any danger." *Id.* We disagreed with the parents' suggestion that "the exhibited behavior must be in a child's presence" and cited numerous cases holding that "a parent can engage in conduct exhibiting wanton disregard for the welfare of the child even during pregnancy so long as the parent knows of the child's existence." *Id.*

In yet another case, a parent argued that her criminal activity did not exhibit wanton disregard for the welfare of her child because another person had custody at the time, and, so the argument goes, the child was not placed in danger or subject to an unjustifiable risk. *In re Serenity L.*, No. E2014-02475-COA-R3-PT, 2015 WL 4594520, at *23 (Tenn. Ct. App. July 31, 2015). We deemed this argument disingenuous, stating:

> The only reason why Mother did not subject the Child to harm or danger by Mother's actions is because Mother did not have custody of the Child during the time period when Mother was engaging in this criminal behavior. Although Mother knew that she was a parent, Mother chose to continue to engage in a life of crime and drug use and abuse. Such actions demonstrate a wanton disregard for the welfare of the Child.

*Id.*

This Court has recognized that "[w]anton disregard has no precise definition." *In re Jase P.*, No. E2016-02519-COA-R3-PT, 2017 WL 2672781, at *10 (Tenn. Ct. App. June 21, 2017) (*no perm. app. filed*). "By defining the term by examples, Tennessee courts have recognized 'wanton disregard' in much the same way as Justice Potter Stewart identified pornography: '[we] know it when [we] see it.'" *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *2 (Tenn. Ct. App. June 9, 2015)

9

(quoting *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (J. Stewart, concurring)). However, we have acknowledged the aforementioned definition of "wanton" provided by *Black's Law Dictionary* and utilized that definition when considering the meaning of "wanton disregard." We said:

> While this statutory ground of abandonment does not require that the parent's action be willful, the parent's conduct cannot support this statutory ground of abandonment without the accompanying display of "a *wanton* disregard for *the welfare of the child*." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). "[W]anton" is defined by Black's Law Dictionary, 9th edition, as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." The consequences at issue in termination cases relate to the child's welfare. In other words, the parent must be indifferent to how their conduct may affect their child's welfare. Tenn. Code Ann. § 36-1-102(1)(A)(iv).

*In re Chandler M.*, No. M2013-02455-COA-R3-PT, 2014 WL 3586499, at *4 (Tenn. Ct. App. July 21, 2014). We find this language entirely consistent with the plain and ordinary meaning of "wanton disregard for the *welfare* of the child," as that phrase is used in the termination statutes. Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). "The consequences at issue in termination cases relate to the child's welfare." *In re Chandler M.*, 2014 WL 3586499, at *4. The parent must be indifferent to how his or her conduct may affect the child's *welfare*, *id.*, but there is no requirement of an immediate physical danger. *See In re Isabella G.*, 2017 WL 4407816, at *7.

"The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child."[3] *In re Anthony R.*, 2015 WL 3611244, at *3. "[A] parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children." *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009).

---

[3]Bryan Garner also provides a helpful explanation:

> The word *wanton* usually denotes a greater degree of culpability than *reckless*. A *reckless* person is generally fully aware of the risks and may even be trying and hoping to avoid harm. A *wanton* person may be risking no more harm than the reckless person, but he or she is not trying to avoid the harm and is indifferent about whether it results.

Bryan A. Garner, *Garner's Dictionary of Legal Usage* 936 (3d ed. 2011).

"Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse." *In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006). Mother's broad pattern of criminal behavior and drug abuse establishes the wanton disregard contemplated by the statute.

## C. *Substantial Noncompliance*

Finally, we consider the ground of substantial noncompliance, which permits a court to terminate parental rights when a parent is in "substantial noncompliance . . . with the statement of responsibilities in [his or her] permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To terminate parental rights on this ground, the court must find the plan's requirements reasonable and related to conditions that necessitate foster care placement. *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *7 (Tenn. Ct. App. May 31, 2017) (*no perm. app. filed*). The court must also find the parent's noncompliance to be substantial. *Id.* "[N]oncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002).

The trial court found that the permanency plans adopted in this case clearly listed in detail the responsibilities placed on Mother and that the DCS case managers discussed the contents and requirements of the permanency plans with Mother. The court found that Mother was fully aware of the statement of responsibilities and action steps she needed to complete. Specifically, she was required to pass random drug screens and pill counts and demonstrate sobriety, comply with the rules for visitation upon passing drug screens, follow the rules of her criminal probation, refrain from incurring new charges, ensure there were no drugs in her home, participate in a clinical drug and alcohol assessment and follow its recommendations, complete parenting classes, provide proof of a legal source of income and stable housing, and complete a budget, transportation plan, and childcare plan. The court found that these responsibilities were reasonable and related to remedying the conditions that necessitated foster care. The court found that DCS caseworkers continuously tried to locate Mother, "made extreme, extraordinary efforts to engage [Mother]," and visited her in jail, but there were some periods when she simply could not be located due to her residing with various relatives and being in and out of jail numerous times. The court found that DCS made numerous unsuccessful attempts to conduct random drug screens when Mother would not show up as agreed or did not answer the phone or return the calls. Regardless of the screening, Mother admittedly continued to use cocaine and heroin. She also violated her probation and continued to incur new criminal charges.

11

The court found that Mother "did make some efforts" to comply with the plan but emphasized how long Mother waited before making those efforts. Mother completed a parenting class, an anger management class, a drug abuse program, and a victims class provided at the prison during her last term of incarceration in 2016, while the termination proceeding was pending. The trial court noted that Mother also completed the alcohol and drug assessment while in jail, but she failed to complete its intensive outpatient treatment recommendation despite entering three different halfway houses. She failed to complete the first halfway house program due to another arrest for possession of cocaine. She was discharged from the second halfway house after six weeks for failing to follow the rules. And, she had only recently moved into the third halfway house and achieved compliance with its rules by the final day of trial. Notably, the court found that DCS had tried to help Mother obtain treatment for her substance abuse problem since the children were placed with relatives in July 2014, "and it was not until her own freedom was at issue and it being a condition of her release from incarceration that she chose to attempt treatment, which she still has failed to complete at this time." The court noted that Mother was released from prison on state probation with the Department of Correction, with the requirement that she complete drug treatment. "Evidently," the court added, "the need to get her children back into her care was not enough for her to seek treatment[,] it took her freedom being at risk." In sum, the court deemed Mother's "11th hour" efforts as "too little, too late," and found based on a totality of the circumstances that she was in substantial noncompliance with the permanency plan.

The trial court's factual findings and conclusions of law regarding this ground are amply supported by the record and caselaw. *See, e.g.*, *In re Isabella G.*, 2017 WL 4407816, at *10 (commending the parents for belated efforts during the termination proceeding but recognizing that improvement can come "too little, too late"). On appeal, Mother does not challenge the trial court's findings mentioned above. Instead, she argues that this Court must vacate the finding of substantial noncompliance with the permanency plan because the permanency plan itself was labeled with sections entitled "description of concern," "desired outcomes," and "action steps," while Mother argues that a "statement of responsibilities" section was necessary. This Court has previously emphasized the importance of including a "statement of responsibilities" in a permanency plan. *See, e.g., In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012) ("It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one."). However, the permanency plans in this case do provide the following statement: "STATEMENT OF RESPONSIBILITIES – This section contains both the desired outcomes and actions steps that together comprise the responsibilities of the parents and/or other responsible person(s) to achieve the permanency goals." We have previously examined this language and deemed it sufficient to clearly communicate a parent's responsibilities. *See In re Isabella G.*, 2017 WL 4407816, at *9. We discern no

12

merit in Mother's argument on appeal regarding this issue.

### D. Best Interest

Although Mother does not challenge the trial court's finding regarding best interest, we have reviewed it in accordance with *Carrington* and find clear and convincing evidence to support the trial court's decision. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive, and the court is not required to find the existence of every factor before concluding that termination is in a child's best interest. *In re Joseph F.*, 492 S.W.3d 690, 706 (Tenn. Ct. App. 2016). The child's best interest must be viewed from the child's perspective rather than that of the parent. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The four children were doing remarkably well in their foster home, where they had resided for two years at the time of trial. The oldest child, who was almost thirteen, had improved her grades from Ds and Fs to As and Bs. She testified as to her realization that it was better for her and her siblings to remain with the foster parents because they were safe there and well cared for. The foster parents wished to adopt all four children. Meanwhile, despite two years of assistance, Mother had not adjusted her circumstances to provide a safe and stable home for the children. Mother was living at yet another halfway house, and her only plan for the children was to bring them to the halfway house to live with her there. By the last day of trial, Mother had only established compliance with the rules at the halfway house for about six weeks. She had not seen the children in over two years. Like the trial court, we conclude that the evidence clearly and convincingly establishes that it is in the best interest of the children for Mother's parental rights to be terminated.

### V. CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is hereby reversed in part, affirmed in part, and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Cassie T. Because Cassie T. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE

13