IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 5, 2026

**IN RE ALEXANDER B.**

**Appeal from the Chancery Court for Claiborne County**
**No. 20282          Elizabeth C. Asbury, Chancellor**

_____

**No. E2025-01580-COA-R3-PT**

_____

In this case involving termination of a mother's parental rights, the trial court determined that clear and convincing evidence supported termination as to two statutory grounds: abandonment by failure to visit and persistence of the conditions that led to the child's removal. The trial court did not find clear and convincing evidence to support the alleged ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the child. The trial court further determined that termination of parental rights was in the child's best interest. The mother has appealed, contesting the termination of her parental rights and additionally arguing that the adoptive father lacked standing to file the petition due to his criminal history and the fact that he is not legally related to the child. Upon review, we determine that the adoptive father had standing to file the termination petition because he had maintained physical custody of the child for nearly a year before filing the termination petition. As to termination of the mother's parental rights, we reverse the trial court's determination that the petitioners had failed to establish the statutory ground of failure to manifest an ability and willingness to assume legal and physical custody of the child. Accordingly, we find that statutory ground also supports termination of the mother's parental rights. In all other respects, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and JEFFREY USMAN, JJ., joined.

Thomas J. Tabor, Jr., Tazewell, Tennessee, for the appellant, Aliyah H.

Aaron J. Chapman, Morristown, Tennessee, for the appellees, Brittany A. and Ronald A.

## OPINION

### I. Factual and Procedural History

This matter involves a Petition to Terminate Parental Rights and Adopt ("the Termination Petition") filed on July 29, 2024, by Ronald A. ("Adoptive Father") and Brittany A. ("Adoptive Mother") (collectively, "Petitioners") in the Claiborne County Chancery Court ("trial court"). In the Termination Petition, Petitioners sought termination of the parental rights of Aliyah H. ("Mother") and Alexander B. ("Father") to Alexander B. ("the Child"), who was born in August 2020.[1] Petitioners additionally sought to adopt the Child.

The facts leading to the filing of the Termination Petition are largely undisputed. On February 7, 2022, Mother and Father were arrested for disorderly conduct following a domestic violence incident between them. On that same day, the Tennessee Department of Children's Services ("DCS") was advised of the parents' arrests by Claiborne County Sheriff's Deputy Randy Wilmoth. Deputy Wilmoth reported that the Child was the "victim of improper supervision." DCS case manager Brianna Greene responded to the deputy's report and interviewed each parent regarding the incident and the Child's well-being. According to Ms. Greene's report, both Father and Mother had informed her that they were homeless. Mother told Ms. Greene that she and Father had a "history of domestic violence," and that the Child would be staying with Mother's paternal grandmother while Mother was incarcerated.

On the day following the parents' arrests, February 8, 2022, DCS filed a "Petition to Transfer Temporary Legal Custody and For Ex Parte Order" in the Claiborne County Juvenile Court ("juvenile court"), requesting that the juvenile court find the Child dependent and neglected and seeking placement of the Child with Father's aunt and uncle, Joseph L. and Jacqueline L. The juvenile court found that because both parents were presently incarcerated and homeless, there existed probable cause that the Child was dependent and neglected pursuant to Tennessee Code Annotated § 37-1-102(b). In turn, the juvenile court placed the Child in the temporary legal custody of Joseph L. and Jacqueline L. and appointed Misty Kennedy as guardian *ad litem* ("GAL"). On May 3, 2022, the Claiborne County General Sessions Court ("general sessions court") dismissed the disorderly conduct charge against Mother.

On May 25, 2022, the juvenile court conducted a review hearing regarding the dependency and neglect allegations. The review hearing order reflected that Mother had

---

[1] Father did not appear in the proceedings below and has not filed an appeal contesting the trial court's order terminating his parental rights. Accordingly, this Opinion addresses Mother's arguments on appeal only.

continued "to fail drug screens for marijuana" and that she had "no housing." Mother admitted that she had manipulated drug tests and expressed a desire to return to Michigan to live with her mother. At that time, Mother was visiting the Child regularly two days per week and had provided "some financial support." Mother relocated to Michigan to live with her mother shortly after the May 25, 2022 review hearing. At a subsequent review hearing conducted on June 29, 2022, DCS closed the case upon determining that both parents had relocated to Michigan and that Mother had "no job, no stable home, no transportation, and ha[d] not provided any proof of clean drug screens." The juvenile court entered an order determining that the Child should remain in the custody of Joseph L. and Jacqueline L. In August 2022, Mother traveled from Michigan to Tennessee to visit with the Child on his second birthday. This was the final in-person visit between Mother and the Child.

On August 25, 2023, Joseph L. and Jacqueline L., together with Adoptive Mother as co-petitioner, filed a petition for change of custody ("Custody Petition"), requesting that the juvenile court transfer custody of the Child to Adoptive Mother. Adoptive Mother is Jacqueline L.'s sister, and is married to Adoptive Father, who is the Child's biological grandfather.[2] The proponents of the Custody Petition explained therein that Adoptive Mother had "maintained a relationship" with the Child during the custodial period and had "already been assisting with daily care" of the Child "since the custodial episode began." The petitioners further averred in the Custody Petition that Adoptive Mother had "appropriate housing," a "valid driver's license[]," and "sufficient income to care for the [C]hild." DCS and the GAL conducted home visits at Adoptive Mother's residence and concluded that the home was "appropriate" such that Adoptive Mother could assume custody of the Child. The juvenile court conducted a hearing relative to the Custody Petition on October 25, 2023, and subsequently granted the petition on November 8, 2023.

On July 29, 2024, Petitioners filed the Termination Petition in the trial court, seeking termination of Mother's and Father's parental rights and adoption of the Child. Petitioners alleged the following statutory grounds for termination: (1) conduct prior to Mother's and Father's incarceration exhibiting a wanton disregard for the welfare of the Child, (2) abandonment by failure to visit the Child, (3) persistence of the conditions that led to the Child's removal, and (4) failure to manifest an ability or willingness to assume legal and physical custody of or financial responsibility for the Child. In addition, Petitioners alleged that termination of Mother's and Father's parental rights was in the best interest of the Child.

---

[2] Father is Adoptive Father's biological son, but Father himself was adopted when he was a child by his step-father, M.B., after Adoptive Father relinquished his parental rights to Father. Adoptive Mother testified that when she, Jacqueline L., and Joseph L. filed the petition for change of custody, she was married to Adoptive Father but had not yet taken his last name. Therefore, Adoptive Mother's surname on the change of custody petitions does not match her surname on the Termination Petition or the proceedings thereafter.

The trial court conducted a hearing on the Petition on June 5, 2025, and July 16, 2025, during which it considered testimony from Adoptive Mother; Adoptive Father; friend of Petitioners, Amanda Farmer; medical assistant, Amanda Leach; Adoptive Mother's sister, Jacqueline L.; Adoptive Mother's mother, Renae C.; Mother; and the maternal grandmother, Angela B. On August 21, 2025, the trial court entered a memorandum opinion terminating Mother's and Father's parental rights. After setting forth several pages of findings of fact, the trial court determined that clear and convincing evidence supported two grounds for termination as to both parents: (1) abandonment by failure to visit the Child and (2) persistence of the conditions that led to the Child's removal. The trial court also determined that clear and convincing evidence supported a finding that termination was in the Child's best interest. On September 9, 2025, the trial court entered a "Final Judgment of Termination and Guardianship" in which the court incorporated its findings of fact and ruling from the August 21, 2025 order, terminated Mother's and Father's parental rights to the Child, and placed the Child under the permanent guardianship of Petitioners. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues on appeal, which we have restated slightly:

1.  Whether the trial court erred by failing to find that Adoptive Father lacked standing to seek adoption of the Child.

2.  Whether the trial court erred by failing to find that Petitioners were required by law to submit to a home study pursuant to Tennessee Code Annotated § 36-1-116(a)(1) upon finding that Petitioners were, in fact, not related to the Child.

3.  Whether the trial court erred in finding, by clear and convincing evidence, that the conditions that led to the removal of the Child from Mother's custody persisted.

4.  Whether the trial court erred in finding, by clear and convincing evidence, that Mother had abandoned the Child by failing to visit.

5.  Whether the trial court erred in finding, by clear and convincing evidence, that termination of Mother's parental rights was in the Child's best interest.

Petitioners raise the following additional issue:

6.  Whether the trial court erred by determining that Petitioners had failed to prove the ground of failure to manifest an ability or willingness to

- 4 -

assume legal and physical custody of or financial responsibility for the Child by clear and convincing evidence.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental

parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Standing

Mother contends that Adoptive Father lacked standing to file the Termination Petition and to seek adoption of the Child because Adoptive Father had previously relinquished his parental rights to Father, who is Adoptive Father's biological son and the father of the Child in the instant case. Mother argues that by giving up his parental rights to Father, Adoptive Father had lost his "legal capacity" to adopt the Child. Mother additionally posits that when Mother and Father were arrested, the juvenile court initially did not allow Adoptive Father to assume physical custody of the Child because Adoptive Father had a criminal history, including that he was a "convicted felon." Mother contends that because Adoptive Father was not granted custody of the Child when the Child was removed from the parents' home, he therefore did not qualify to join in the Termination Petition as a prospective adoptive parent. Mother additionally avers that Adoptive Mother intentionally "deceive[d]" the juvenile court by using a different surname to disguise the fact that she was married to Adoptive Father when she sought transfer of custody of the Child.

Mother initially raised the issue of standing before the trial court in the form of a motion for a directed verdict, arguing that due to his criminal history, Adoptive Father

could not qualify as a "prospective adoptive parent" as defined in Tennessee Code Annotated § 36-1-113(b), and therefore was not among the category of individuals who could file a petition for termination of parental rights. Tennessee Code Annotated § 36-1-113(b)(1) (West July 1, 2024 to current) provides in relevant part:

> The prospective adoptive parent or parents, including extended family members caring for a related child, a licensed child-placing agency having physical custody of the child, the child's guardian ad litem, or the department have standing to file a petition pursuant to this part or title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of the child[.]

Tennessee Code Annotated § 36-1-102 defines "prospective adoptive parents" as, *inter alia*, "nonagency person[s] who have filed a petition for termination or for adoption[.]"

In response to Mother's motion for a directed verdict, Petitioners countered that the definition of "prospective adoptive parent," as found in Tennessee Code Annotated 36-1-102, includes a "person who has filed a petition for termination" and that because Adoptive Father had filed the Termination Petition with Adoptive Mother, he was therefore included in the statutory definition of "prospective adoptive parent." After hearing the parties' arguments, the trial court agreed with Petitioners and determined that Adoptive Father was a "prospective adoptive parent within the meaning of [§ 36-1-102]" because Adoptive Father had filed the Termination Petition "seeking ultimately to adopt."

On appeal, Mother does not contest the trial court's application of the statutory definition of "prospective adoptive parent," and we find no reason to disturb the trial court's determination in that regard. Instead, Mother asserts that Adoptive Father lacked standing to file the Termination Petition because at the time of the Child's removal from Mother's custody, DCS had refused to place the Child with Petitioners due to Adoptive Father's "criminal background[.]" Mother points to testimony during trial revealing that when Mother and Father were arrested, DCS could not "clear" Adoptive Father to receive physical custody of the Child due to Adoptive Father's "felony record." Mother argues that Adoptive Father thus did not have the required "right to receive physical custody" of the Child.

Petitioners do not dispute that Adoptive Father had a criminal record or that DCS initially declined to place the Child with Petitioners because of Adoptive Father's felony convictions. However, the juvenile court later granted legal custody of the Child to Adoptive Mother—who was married to and living with Adoptive Father—by an order entered in August 2023. Notably, DCS and the GAL conducted home visits of Petitioners' residence at that time to ensure that Petitioners' home was suitable for the Child. Thus, despite DCS's earlier reservations concerning Adoptive Father when the Child was first removed into protective custody, DCS, the GAL, and the juvenile court all appear to have

agreed by August 2023 that it was proper for the Child to reside in Adoptive Father's home despite Adoptive Father's past criminal record. The Child had resided with Petitioners exclusively and continuously thereafter.

Mother relies on language from this Court's decision in *In re Joseph F.*, 492 S.W.3d 690 (Tenn. Ct. App. 2016) to argue that because Adoptive Father was not permitted initially to receive physical custody of the Child, he lacked standing to file a petition for termination of parental rights as a prospective adoptive parent. The relevant portion of *In re Joseph F.* provides as follows:

> Tennessee Code Annotated section 36-1-115(b) imposes the following requirements for persons filing an adoption petition:
>
> > The petitioners must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6) [statute regarding surrender/parental consent] at the time the petition is filed, unless they are filing an intervening petition seeking to adopt the child.
>
> Thus, a person or persons filing for adoption must have physical custody of the child or the right to receive physical custody pursuant to a valid surrender. Tenn. Code Ann. § 36-1-111(d)(6); *see In re Adoption of M.J.S.*, 44 S.W.3d 41, 49 (Tenn. Ct. App. 2000) (discussing adoption statutes).

*In re Joseph F.*, 492 S.W.3d at 697 (quoting *In re Sonya M.*, No. M2015-00064-COA-R3-PT, 2015 WL 4381567 at *2-3 (Tenn. Ct. App. July 16, 2015)) (emphasis added). The *In re Joseph F.* Court concluded:

> Upon a careful review of the termination/adoption provisions found in Title 36 as a whole, along with applicable precedent, we conclude that "physical custody" means physical possession of a child, as granted by a parent, guardian, child-placing agency, or court. We therefore conclude that because the [adoptive parents] had physical possession and therefore physical custody of the Children at the time of the petition's filing, they have standing to seek termination of Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-115.

*In re Joseph F.*, 492 S.W.3d at 701.

Adoptive Father lived with and cared for the Child as a parental figure from August 2023 until July 2024, pursuant to an order of the juvenile court. Thus, Adoptive Father

maintained "physical custody" of the Child during that period, as that term is understood and defined in *In re Joseph F.* *See id.* Therefore, in keeping with the determination set forth by the *In re Joseph F.* Court, we determine that Adoptive Father had standing to file the Termination Petition and to seek adoption of the Child. *See id.*

Regarding Mother's claim that Adoptive Mother intentionally hid her marriage with Adoptive Father from the juvenile court by using a different surname when seeking the transfer of custody, we find no evidence to support this assertion. When questioned about use of her prior last name on the Custody Petition, Adoptive Mother explained that she and Adoptive Father were married at the time she filed the petition but that she had not yet assumed Adoptive Father's last name. Mother did not present any countervailing testimony or proof to contradict this explanation. Furthermore, DCS and the GAL would have known that Adoptive Mother and Adoptive Father were married and residing together when they conducted the home inspections at that time. We therefore find Mother's argument on this point unavailing.

## V. Home Study Requirements for Adoption Pursuant to § 36-1-116

Mother argues that because Petitioners were not related to the Child, the trial court erred in "not finding that [Petitioners] were required by law to submit a home study pursuant to [Tennessee Code Annotated] § 36-1-116(a)(1)." Section 36-1-116(a)(1) (West July 1, 2024 to current) requires that "prior to filing a petition for the adoption of a child, the prospective adoptive parents shall . . . request a home study . . . concerning the suitability of their home and themselves as adoptive parents[.]" Such requirement may be waived if the child is "to be adopted by related persons." Tenn. Code Ann. § 36-1-116(a)(1).

Here, Petitioners filed for termination and "to adopt," requesting that the trial court waive the home study requirement. However, in the alternative, Petitioners requested that the trial court "enter an appropriate order of reference for a home study and enforce an appropriate waiting period should the court not declare the Petitioners to be related [to the Child] under law." Upon review, we determine that Petitioners' request in the alternative for a home study order complies with the requirements of § 36-1-116(a)(1). Significantly, the trial court did not order that the Child be adopted by Petitioners. The trial court stated from the bench that a home study "is going to be required" before Petitioners would be cleared to adopt the Child "if we get to that point." In the order terminating parental rights, the trial court ordered that the Child "shall be placed in the full guardianship of the Petitioners." For the foregoing reasons, we find no error in the trial court's judgment respecting this issue.

## VI. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current)[3] lists the statutory requirements for termination of parental rights, providing in relevant part:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court concluded that the evidence clearly and convincingly supported two statutory grounds to terminate Mother's parental rights: (1) persistence of the conditions that led to the Child's removal from the parents' custody and (2) abandonment by failure to visit the Child. The trial court determined that the evidence did not clearly and convincingly support Petitioners' alleged ground of failure to manifest an ability or willingness to assume legal and physical custody of or financial responsibility for the Child, and Petitioners have challenged that ruling on appeal. We will address each statutory ground in turn.[4]

---

[3] Unless otherwise noted, throughout this Opinion, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Termination Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the subsection that was in effect at the time the Termination Petition was filed has not changed and therefore remains current.

[4] Prior to the termination hearing, Petitioners withdrew the alleged ground of conduct prior to Mother's and Father's incarceration exhibiting a wanton disregard for the welfare of the Child. Accordingly, the trial court did not address that ground, and it is not a subject of this Opinion.

A. Statutory Abandonment by Failure to Visit

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1) (West July 1, 2024, to May 4, 2025) in effect when the Termination Petition was filed provided the following definition of abandonment as pertinent here:

For purposes of terminating the . . . rights of a parent . . . of a child to that child to make that child available for adoption, "abandonment" means that:

* * *

(A)(i) (*b*) If the child is less than four (4) years of age at the time of the filing of a petition for termination of parental rights, for a period of three (3) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

* * *

(E)     For purposes of this subdivision (1), "failed to visit" means the failure, for the applicable time period, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant time period[.]

- 11 -

Regarding the period applicable to the ground of abandonment by failure to visit, the trial court found:

> The Petition for Termination of Parental Rights and Adoption was filed on July 29, 2024. Generally, the relevant four (4) month period of time for abandonment purposes is from March 28, 2024 through July 28, 2024. However, this child was three (3) years old at the time the Petition was filed. Therefore, pursuant to T.C.A.§ 36-1-102 (2024) the relevant time period is three (3) months prior to the filing of the Petition. However, Petitioners referenced the four (4) month time period and the Court will analyze with a four (4) month period.

(Paragraph numbering omitted.)

The trial court set the period for calculating statutory abandonment from March 28, 2024, through July 28, 2024 ("the Determinative Period").[5] However, the trial court should have set the beginning date as March 29, 2024, rendering a statutorily determinative period spanning March 29, 2024, through July 28, 2024. *See In re Joseph F.*, 492 S.W.3d at 702 (explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)). Because we find that this one-day difference in the beginning of the Determinative Period does not affect our analysis of this statutory ground, we conclude that the trial court's inclusion of the extra day constitutes harmless error. *See, e.g.*, *In re Kierani C.*, No. E2020-00850-COA-R3-PT, 2021 WL 4057222, at *8 (Tenn. Ct. App. Sept. 3, 2021).

At the outset, the trial court determined that Mother had waived the affirmative defense of lack of willfulness regarding this ground because she did not raise the defense in either her initial response or in her amended answer to the Termination Petition. Tennessee Code Annotated § 36-1-102(1)(I) provides:

---

[5] Regarding the trial court's use of the four-month period to analyze this ground rather than the correct three-month period, *see* Tenn. Code Ann. §36-1-102(1)(A)(i)(b), Petitioners alleged the ground of abandonment in the Termination Petition using a four-month determinative period and reiterated at trial that the court could "go with either one" in analyzing the allegation of abandonment. Neither party has raised an issue on appeal regarding the trial court's use of the four-month Determinative Period. We note that the trial court's reference to the four-month period encompassed the properly calculated three-month period. We therefore determine any error on the trial court's part in using a four-month determinative period relative to this ground to be harmless. *See* Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Mother acknowledges that she "did not aver any affirmative defense" in her answer but contends that she instead denied the allegation of abandonment in its "entirety" "due to the actions and behavior of the [Petitioners]." Thus, Mother appears to be asserting that she did raise the affirmative defense of lack of willfulness even though she did not expressly present the argument as a separate affirmative defense in her amended answer. In paragraph nine of her amended answer to the Termination Petition, Mother responded to the statutory abandonment allegation by averring that she had

maintained inconsistent contact with Petitioners [regarding the Child] due to the fact that the Petitioners have made it difficult, if not impossible, for her to video chat with [the Child] by their unreasonable time of Wednesdays at 7:00 a.m. for video calls and their refusal to answer video chat calls.

Although Mother did not use the word "willful" or expressly designate this response as an affirmative defense to the allegation of abandonment, such failure to properly designate an affirmative defense is not necessarily fatal to the defense. *See* Tenn. R. Civ. P. 8.03 ("When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court, if justice so requires, shall treat the pleading as if there had been a proper designation.").

Moreover, at trial, Mother's counsel argued that Mother's failure to visit the Child during the Determinative Period was "not willful" because Mother had "tried to visit, and [Petitioners] ha[d] denied that each and every time." Petitioners did not object to this argument. During her testimony, Mother explained that although she had attempted to contact the Child by telephone on numerous occasions, Petitioners had often refused to allow her to speak with the Child. In support, Mother provided a monthly calendar spanning October 2022 to February 2025. The calendar included, *inter alia*, Mother's handwritten notes detailing her attempts to contact the Child by telephone or video call. Petitioners did not object to Mother's testimony in this regard or to the entry of the calendar as an exhibit.

In the context of an abandonment allegation, this Court has deemed lack of willfulness to have been tried by implied consent, pursuant to Tennessee Rule of Civil Procedure 15.02. *See, e.g.*, *In re Elijah F.*, No. M2022-00191-COA-R3-CV, 2022 WL 16859543, at *6 n.7 (Tenn. Ct. App. Nov. 10, 2022); *In re Lauren F.,* No. W2020-01732-

- 13 -

COA-R3-PT, 2021 WL 5234712, at *8 (Tenn. Ct. App. Nov. 10, 2021). Even if we were to assume for purposes of argument that lack of willfulness was tried by consent, Mother still has failed to meet her burden.

Regarding lack of willfulness, this Court has previously explained:

Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (internal citations and footnotes omitted). Here, although the trial court determined that Mother had waived her opportunity to raise lack of willfulness as an affirmative defense, the court nonetheless addressed Mother's claims in this regard in its analysis of the statutory ground of abandonment. Specifically, the court found:

Mother admits that her last video chat with the child was on April 14, 2024. She claims to have made numerous attempts to speak with the child thereafter until February 20, 2025 and her requests were denied.

However, the calendar supplied by Mother confirms a very small number of attempts at communicating with the child until March, 2024. Additionally, Mother's calendar reflects that she planned to visit with the child in Tennessee in July, 2023 but she "failed due to financial shortcomings." In October, 2023 she planned a trip to visit the child on October 24th but "was unable to visit due to lack of support." At no point during the relevant four (4) month period did she make [any serious] effort whatsoever to visit with the child as reflected in her calendar. There was no proof that she tried to acquire a bus ticket or ask Petitioners to assist her in some way.

* * *

[Adoptive Mother] testified that Mother's requests to communicate with the child came in spurts. She stated that Mother may go six (6) months with no attempts to communicate. She did confirm that Mother did have approximately 7 to 8 telephone conversations with the child in 2024. During the relevant four (4) month period before the filing of the Petition, Petitioner[s] acknowledged that Mother had called the child. However,

- 14 -

Mother made no requests to visit with the child. During the relevant four (4) month period there were absolutely no denials of visitation with the child. After the Petition was filed, Mother asked for a visit and was told that she needed to set it up through a professional supervised visitation program. That was never arranged by Mother.

* * *

T.C.A. § 36-1-102(E) states the following [regarding the statutory ground of abandonment by failure to visit]: "failed to visit means the failure, for the applicable time period, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant time period."

Based on the facts hereinabove set forth, Mother made no visits within the relevant time period. She had no contact whatsoever since February, 2022. Her phone calls were token at best. This ground has been proven by clear & convincing evidence.

(Paragraph and exhibit numbers omitted.)

Upon careful review of the entire record, we agree with the trial court. It is undisputed that Mother did not attempt to visit the Child in person during the Determinative Period and in fact did not visit with the Child at any time following the Child's second birthday in August 2022. After the Child was removed into protective custody, Mother made no effort to regain legal custody of the Child or to resume supervised visitation with the Child once she was settled out of state. Moreover, Mother presented no evidence that Petitioners had denied her access to the Child.

Regarding Mother's purported telephone calls to the Child during the Determinative Period, the trial court concluded that Mother's calls were "token at best." Tennessee Code Annotated § 36-1-102(1)(C) defines "token visitation" as "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Whether a visit is token is therefore, a "particularly fact-intensive inquiry." *See Autumn L. v. James C.*, No. M2024-01350-COA-R3-PT, 2025 WL 3641550, at *9 (Tenn. Ct. App. Dec. 16, 2025) (quoting Tenn. Code Ann. § 36-1-102(1)(C)). This Court has often addressed whether telephonic visitation with a child can suffice as a substitute for in-person visitation. *See id.* (collecting cases). We have held that "telephone calls may be sufficient under circumstances where the parent cannot feasibly exercise in-person visitation." *See id.* (collecting cases).

- 15 -

Here, however, we agree with the trial court that Mother's telephone call with the Child was "token at best" during the Determinative Period. Mother engaged in one phone call with the Child during that timeframe on April 14, 2024. Significantly, Mother and Petitioners had arranged for Mother to enjoy a weekly phone call with the Child on Wednesday mornings at 7:00 a.m., but testimony at trial revealed that Mother had only participated in that weekly phone call "one time" between November 2023 and July 2024. There is no evidence that Mother attempted to arrange any in-person visitation with the Child during the Determinative Period, despite her averments that she had obtained a vehicle and gainful employment during that time. Mother had not attempted to increase her visitation times and had not filed for custody of the Child since she had moved to Michigan in 2022. For the above-stated reasons, we determine that the evidence preponderates in favor of the trial court's determination, by clear and convincing evidence, that Mother had abandoned the Child by failing to visit.

### B. Persistence of Conditions Leading to the Child's Removal

The trial court determined that the statutory ground of persistence of the conditions leading to removal of the Child from Mother's custody had been proven by clear and convincing evidence. The version of Tennessee Code Annotated § 36-1-113(g)(3) (West July 1, 2024, to June 30, 2025) in effect when the Termination Petition was filed provided the following regarding this ground:

(A)   The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i)   The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In the instant case, the trial court recounted the above statutory provision and then summarized its findings regarding this ground as follows:

Base[d] on the facts hereinabove set forth, the child has clearly been removed from the Mother's home for a period [in] excess of six (6) months by a Court Order which found the child to be dependent and neglected. Although Mother's conditions have greatly improved over time and she is no longer in an abusive relationship with Father, she is not in a current position to take custody of the child. By her own admission, a return [of] custody to her would require a lengthy transition period for the child. Additionally, she has not shown proof of compliance with all of the requirements placed upon her by the Claiborne County Juvenile Court. The requirement of a lengthy transition period obviously confirms that there is little likelihood that the child could be returned to her at an early date. Return to Mother, in all probability, would subject the child to further neglect. Additionally, it appears that she continues living a lifestyle with illegal drugs and alcohol. Additionally, continuing the parent/child relationship in this situation greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Therefore, the Court does find clear and convincing evidence to support termination of parental rights pursuant to T.C.A. § 36-1-113(g)(3).

(Paragraph numbering omitted.)

In her appellate brief, Mother acknowledges that Petitioners established the first prong of this statutory ground: that the Child had been removed from Mother's custody for a period longer than six months by a court order, namely the juvenile court's protective custody order of February 8, 2022. However, Mother asserts on appeal that the conditions that led to the Child's removal were no longer present at the time of trial. Mother avers that she (1) is "no longer in a toxic relationship with [Father]"; (2) has "long ago resolved all of her [criminal] issues"; (3) is employed full time as a shift manager at Papa Murphy's; (4) owns reliable, insured transportation; and (5) "has a place to live, and the means to care for [the Child]." Mother further contends that Petitioners and Jackie L. remained "unaware" of Mother's life improvements "because they intentionally and blatantly failed to communicate" with Mother. Finally, Mother posits that given the opportunity, she is "ready, willing, and able" to regain custody of the Child and to "raise him in a stable, non-violent, drug free home[.]"

The evidence corroborates Mother's claims that she was no longer in a relationship

with Father when the Termination Petition was filed and that the disorderly conduct charge against her had been dismissed as of May 2022. However, regarding the purported positive changes in Mother's life, we note that Mother initiated most of these changes only after the Child had been living in protective custody for over two years, with some advances occurring once the Termination Petition was filed in July 2024. Concerning housing, Mother testified that as of July 2025, she had secured stable housing, explaining that she had been residing in the same apartment with a co-worker for "a year," on a "month to month lease." However, Mother admitted that in this housing arrangement, Mother was renting a bedroom in her roommate's home and did not own most of the furniture in the home. She further testified that she had secured this housing in June 2024, one month before the Termination Petition was filed. Prior to July 2024, Mother had lived at various times with her mother, a "father figure," and in a condition she described as "homeless and using my mom's address."

Regarding her employment, Mother explained that she had been employed at Papa Murphy's for "about eight months" as of July 2025, demonstrating that Mother had not begun working there until several months after the Termination Petition was filed. Before Mother worked at Papa Murphy's, she was employed at a "Taco John's for nine months" and at a "Speedway" for an undetermined length of time. It is unclear from the record whether there existed any gaps in Mother's employment history or whether her previous jobs were full-time or part-time work. Regarding transportation, Mother testified that she had been given a "2004 Pontiac Grand Prix" by a "father figure" but also averred that she had only obtained a driver's license in June 2024, one month before the Termination Petition was filed.

Mother urges that she is "ready, willing, and able" to offer the Child a "stable, non-violent, drug-free home." Yet Mother's continued drug use and frequent changes of residence in the intervening years after the Child was removed into protective custody tell a different story. With reference to Mother's drug use, testimony from the Child's maternal grandmother evinced that Mother smoked marijuana during her pregnancy with the Child, throughout his infancy, and up until "about a year" before the hearing (approximately July 2024). In June 2022, DCS closed the dependency and neglect proceedings upon a finding that Mother had "not provided any proof of clean drug screens." Jacqueline L. testified regarding the closure of the case, stating that Mother had "failed a drug test." When asked about her continued use of marijuana, Mother explained that she had not participated in any rehabilitation program but claimed that she had quit "cold turkey." Despite this averment, Mother admitted during trial that she had smoked marijuana as recently as October 2024, several months after the Termination Petition had been filed.

Depending upon the circumstances of a particular case, a parent's positive adjustments in lifestyle and circumstance can be considered "too little, too late" if they are made following a long delay or only after a termination petition is filed. *See, e.g.*, *In re Jaidon S.*, No. M2021-00802-COA-R3-PT, 2022 WL 1017230, at *7 (Tenn. Ct. App. Apr.

5, 2022); *In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *16 (Tenn. Ct. App. Aug. 20, 2020) (affirming the trial court's conclusion that the mother's positive lifestyle adjustments that began "after the filing of the termination petition" were "too little, too late."); *In re Austin D.*, No. E2012-00579-COA-R3PT, 2013 WL 357605, at *13 (Tenn. Ct. App. Jan. 30, 2013) (noting that efforts to take required anger management classes two years after first ordered to so do were "too little, too late" for purposes of the ground of persistence of conditions).

Here, we find that Mother's positive adjustments in lifestyle, while commendable and a credit to her, were in fact too little, too late because most of these changes were made more than two years after the Child was removed from Mother's custody, and many were made after the Termination Petition was filed. Although Mother did comply with some of the requirements set forth by the juvenile court in 2022, such as obtaining "a legal source of income" and completing mental health and alcohol and drug assessments, Mother did not secure stable housing or reliable transportation until June 2024 or later and did not cease using illicit drugs until at least October 2024.

Regarding whether the Child could be returned to Mother safely in the near future, the trial court found that by Mother's own admission, "a return [of] custody to her would require a lengthy transition period for the child." Mother acknowledged that if the Child were to be returned to her custody, it would be "a lot on a 4-year old . . . to be uprooted from something that they know." The Child's maternal grandmother also testified that any return to Mother's custody would be "a long process" for the Child and that for this reason the Child would have to "go through therapy" because it would be "a lot of new things for him." The evidence preponderates in favor of the trial court's determination.

Testimony during trial also supported termination relative to the final inquiry of this statutory ground: whether continuation of the parent and child relationship would greatly diminish the child's chances of early integration into a safe, stable, and permanent home. Jacqueline L., Adoptive Mother, and Adoptive Father all testified that the Child had come to know Petitioners as parent figures, calling them "mom" and "dad," and that the Child had been integrated into their family, their circle of friends, and their church family. The Child also attended a "Head Start" program near Petitioners' home, participated in sports, and had been receiving regular care from health providers such as speech and occupational therapists. By contrast, the Child had not seen Mother since his second birthday in 2022 and did not consider Mother to be a parental figure. According to Mother, when she spoke with the Child via video calls, "[a]s far as he's concerned, he's talking to some lady on the phone. That's all it is to him." Despite Mother's concern that the Child did not know her, Mother conceded that she did not attempt to arrange for visitation with the Child after his birthday in August 2022.

Upon careful review, we affirm the trial court's determination that Petitioners successfully established the statutory ground of persistence of the conditions that led to

removal of the Child by clear and convincing evidence.

### C. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2024, to current) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show by clear and convincing evidence that (1) Mother had failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.") (citation omitted).

As to the first prong, our Supreme Court has instructed:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While

the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

In the instant action, the trial court determined as follows:

> The Court does not find by clear and convincing evidence that [Mother] has failed to manifest by act or omission an ability or willingness to personally assume legal and physical custody or financial responsibility pursuant to T.C.A. § 36-1-113(g)(14) and, likewise, that placing the child in her legal and physical custody would pose a risk of substantial harm to the child in that there was no proof of risk of substantial harm to the child.

On appeal, Petitioners assert that the trial court erred by not finding clear and convincing evidence to support both prongs of this statutory ground for termination. Respecting the first prong, Petitioners argue that Mother had "never shown an ability to resume custody of the [C]hild," having spent the Child's "entire childhood failing to keep stable housing, employment or transportation resources." Petitioners point to Mother's own admission that she "suffered from debilitating untreated mental health conditions and only began treatment for them during the pendency of this action." Petitioners also contend that Mother demonstrated a lack of willingness to assume legal custody when she relocated to Michigan after the Child's removal "without completing steps necessary to regain legal custody" of the Child, failing to seek formal visitation with the Child until after the Termination Petition was filed, and failing to visit in-person with the Child at any time after August 2022. Based upon these facts and the evidence delineated above supporting the grounds of abandonment and persistence of conditions, we agree that clear and convincing evidence demonstrates that Mother failed to manifest both an ability and a willingness to assume physical and legal custody of the Child.

Moving to the second prong—whether returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare—Petitioners urge that a "reasonable person would be justified in foreseeing substantial harm" to the Child were he to be placed in Mother's custody. Petitioners further argue that Mother's

> removal of herself from the child's life early in the child's toddlerhood and her cycle of functional homelessness, untreated mental illness, and a lack of contact efforts militated together to demonstrate that placing the child in her care would result in substantial harm to the child, who was thriving with Petitioners at the time of trial.

- 21 -

We note that at the time of the termination trial in June and July 2025, the Child had not resided with or had in-person contact with Mother for almost three years. The most recent contact between Mother and the Child was a video call that occurred in April 2024, fourteen months before the first day of trial. Meanwhile, the Child had bonded with Petitioners and their children, extended family, and community. Mother lamented during her testimony that the Child knew her only as "some lady," whereas, by contrast, the Child had grown attached to Petitioners, calling them "mom" and "dad." Testimony established that the Child was active in church and sports, engaged in learning at a Head Start program, participated in important occupational and speech therapy sessions, and had bonded with his foster-siblings. Petitioners expressed their love for the Child and their hopes to adopt him some day.

This Court has previously determined that removing a child who has "bonded and thrived" with his or her current family to return the child to a parent with whom the child does not have a bond amounts to substantial harm. *See, e.g.*, *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year). In the case at bar, the Child was only eighteen months old when he was removed into protective custody, and by the time of trial, he did not consider Mother a parental figure or even appear to know who she was. Indeed, the trial court indicated as much in its analysis of the best interest factors, stating: "The child no longer has a parental relationship with Mother. He is a part of Petitioner[s'] family. Petitioners have a parental relationship with the child."

For the above-stated reasons, we determine that the Child would likely suffer substantial harm if removed from the care of Petitioners, with whom he has resided for years and established an enduring bond. We therefore reverse the trial court's determination that this statutory ground had not been established by clear and convincing evidence and find that it supports termination.

## VII. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn.

2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)   The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)   Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)   Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)   Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)   Whether the child is fearful of living in the parent's home;

(G)   Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)   Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)   Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or

foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)    Whether the parent has consistently provided more than token financial support for the child; and

(T)    Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides:  "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."  Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis.  In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).  Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence."  In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861).  "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]."  Id.  When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective."  In re Audrey S., 182 S.W.3d at 878.  Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors.  Id.  "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."  Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors.  In re Audrey S., 182 S.W.3d at 878.  And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination.  White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).  Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case.  See In re Audrey S., 182 S.W.3d at 878.  Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.  In re Carrington H., 483 S.W.3d at 523.  "[D]epending upon the

circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In this case, the trial court considered each of the best interest factors and concluded that clear and convincing evidence demonstrated, "in totality," that termination of Mother's parental rights was in the Child's best interest. Upon careful review, we determine that the trial court's conclusion regarding the best interest factors, together with the trial court's separate, extensive findings of fact, is supported by a preponderance of the evidence.

The trial court determined that factors (F) (whether the child is fearful of living in the parent's house) and (L) (whether DCS has made reasonable efforts to assist the parent in cases where the child is in DCS custody) were inapplicable to the instant case. Upon review, we agree with the trial court as to these factors. The record is devoid of evidence concerning whether the Child was fearful of living in Mother's house. Factor (L) does not apply because the Child was never in DCS custody. Similarly, the trial court determined that factor (G)—whether the parent's home or others in the parent's household triggered or exacerbated the child's experience of trauma or post-traumatic symptoms—was "unknown." Because there was no evidence concerning Mother's home and its effect on the Child, who had never visited there, we determine that this factor is also inapplicable to our inquiry. *See In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *11 (Tenn. Ct. App. Jan. 21, 2025) (affirming the trial court when it found that factor (G) was "inapplicable due to the lack of proof on that issue.").

The trial court also deemed inapplicable factor (N) (whether the parent or other person residing with or frequenting the home of the parent has shown brutality or abuse or neglect toward the child or any other person). However, we disagree that factor (N) does not apply to this action. There was extensive testimony regarding Father's physical abuse of Mother during her pregnancy with the Child and after the Child was born. Although Mother had since moved away from Father and was recovering from her physical and emotional injuries resulting from Father's abuse, the parents' "toxic" relationship was a major theme during trial, and, indeed, Father's violence toward Mother was the precipitating event that caused DCS to intervene and remove the Child into protective custody. Additionally, Mother repeated that she had been "mentally ill" and had suffered from "PTSD" because of Father's violence. Notably, factor (N) does not contemplate a

time limit. Instead, it merely questions whether a parent or other person residing with the parent "has shown brutality" or physical abuse toward the child or other adult. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N). In this case, Father had shown brutality and physical abuse toward Mother, and Mother had continued to live with Father for some time even after the Child was removed into protective custody. For these reasons, we determine that Factor (N) weighs in favor of termination. For the same reasons, we agree with the trial court that factor (O) (whether the parent has ever provided safe and stable care for the child or any other child) weighs in favor of termination "based on the domestic violence issues going on between the biological parents and drug use[.]" There was no evidence presented that Mother had ever provided safe and stable care for any child.

We next consider the best interest factors related to the Child's emotional needs. *See In re Colten B*., 2025 WL 252663, at *8 ("Appellate courts often 'group our discussion of the best interest factors based on the overarching themes within the list of twenty factors. . . because many of these factors touch on similar factual predicates and involve similar issues.'" (quoting *In re Kurt R*., No. E2023-01108-COA-R3-PT, 2024 WL 4040828, at *13 (Tenn. Ct. App. Sept. 4, 2024))) (internal quotation marks omitted). Factors relating to the Child's emotional needs include factor (A) (regarding a child's need for stability), (B) (concerning how changes in a child's caretakers affect the child's well-being), (C) (regarding the parent's continuity and stability in meeting the child's needs), (D) (regarding parent-child attachment and expectation thereof), (E) (respecting visitation between parent and child), (H) (relative to the child's parental attachment to others), (I) (concerning the child's relationship with others), and (T) (relative to the parent's fitness to parent and the impacts of that fitness).

Regarding factor (A), the trial court found that the Child was "in a stable and appropriate environment with Petitioners" and concluded that termination of Mother's parental rights would thus ensure the Child's need for stability and continuity of placement. As to factor (B), the court noted that the Child "no longer ha[d] a parental relationship with Mother" but was instead "a part of Petitioners' family" such that a change of caretakers and physical environment would "likely have an adverse and devastating effect" on the Child's emotional and psychological well-being. Relative to factor (C), the court stated that Mother's efforts had been "too little and too late." The court specifically found that although Mother had paid "some child support," she had made "no effort" to provide support from her current employment. Additionally, the court found that Mother's living situation had not been "a stable environment for a lengthy period of time to properly take care of the [C]hild." Regarding factor (E), the court found that Mother had not maintained regular visitation or contact with the Child and thus had not cultivated a positive relationship with the Child. For the reasons stated above relative to the grounds of abandonment, persistence of conditions, and failure to manifest an ability and willingness to assume custody of the Child, we determine that the evidence preponderates in favor of the trial court's findings as to factors (A), (B), (C), and (E).

As to factor (D), the trial court simply stated that the Child had a secure and healthy attachment to Petitioners and did not have such an attachment to Mother. For factor (H), the court concluded that the Child had "created healthy parental attachments with both Petitioners in the absence of Mother[.]" Concerning factor (I), the court delineated that the Child had enjoyed significant relationships with "Petitioners, the other children in Petitioners' home, Jacqueline [L. and her husband], Renae C., his grandmother figure, his church family, and his school family." The court further noted that because Adoptive Father is the Child's "biological grandfather," it appeared that the Child would have access to information regarding his heritage. Upon reviewing the evidence that relates to the Child's parental attachments and relationships with significant adults in his life, we determine that the evidence preponderates in favor of the trial court's conclusions as to factors (D), (H), and (I).

Concerning factor (T), the trial court noted that Mother had "testified that she was not using drugs" but that Mother's "social media indicate[d] that she continue[d] to abuse alcohol and marijuana" and had provided "no documentation to confirm her lack of drug use." Indeed, Mother admitted that she had posted a picture of herself smoking marijuana as recently as December 2025. Additionally, Mother testified during trial that she had been "extremely depressed" and had been "extremely mentally ill" during the first three years after she lost custody of the Child. Mother also testified that she suffered from "PTSD" and had begun therapy in January 2025. Despite Mother's and the maternal grandmother's averments that Mother had been attending therapy, the trial court found that Mother had "provided no records to prove that she had actually attended counseling/therapy." The evidence supports the trial court's findings relative to factor (T).

Respective of factor (J)—whether a parent has demonstrated a lasting adjustment of circumstances of conditions or conduct making it safe for the child to be in the parent's home—the trial court acknowledged that Mother had demonstrated an adjustment of her circumstances and conduct but cautioned that whether it is a "lasting adjustment is unknown." The court then referenced Mother's claims that she is "drug free" against the countervailing evidence that Mother "continues to appear in social media smoking pot and using alcohol and possibly other substances." Considering the evidence, we determine that Mother's adjustments in circumstances and conduct, particularly regarding living arrangements, transportation, and therapy, were all made within a year of the trial in June and July 2025. Thus, Mother had not demonstrated any "lasting" adjustments as contemplated by this factor, and the trial court properly weighed this factor in favor of termination.

Concerning factor (K)—whether the parent has taken advantage of available programs, services, or community resources to make a lasting adjustment of circumstances, conduct, or conditions—the trial court stated: "It does appear that Mother took advantage of some programs available to her such as domestic violence programs and parenting classes. However, she only began therapy recently." It is unclear whether the trial court

weighed this factor for or against termination or whether it weighed neutrally. The record reflects that Mother did participate in the services mentioned by the trial court as well as completing alcohol, drug, and mental health assessments. Mother had also begun therapy in January 2025. However, as with factor (J), proof of "lasting" adjustments by Mother is lacking. Factor (K) weighs in favor of termination.

Respecting factor (M)—whether the parent has demonstrated a sense of urgency in seeking custody of the child—the trial court found that Mother had not demonstrated a sense of urgency because she had "filed no pleadings to seek visitation or custody." For that reason and considering our conclusions delineated above relative to the statutory grounds of abandonment, persistence of conditions, and failure to manifest, we agree that factor (M) weighs in favor of termination.

As to factor (P)—whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive—the trial court stated that Mother seemed to know what the child's basic and specific needs were, but the court was "not convinced that [Mother] ha[d] demonstrated same." Upon review, we determine that this factor weighs in favor of termination. Mother did not at any time demonstrate an interest in or commitment to building a consistent parent-child relationship with the Child and admitted that she rarely contacted Petitioners regarding the Child because she felt "alienated" from them to the point that Mother did not know that the Child was receiving speech or occupational therapy until she heard testimony about it from Petitioners during the trial.

For similar reasons, factor (Q) also weighs in favor of termination. Factor (Q) addresses whether a parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive. Mother had demonstrated that she herself had acquired stable housing as of June 2024 but did not mention any steps she had undertaken to prepare the home to receive the Child. When pressed about her living situation, Mother explained that she was "renting a bedroom" in a friend's house and that the friend owned most of the furniture and other amenities in the house. Mother did not demonstrate any of the preparations or permanency required to provide a safe and stable home for the Child.

Turning to factor (R), the trial court stated that it was "unclear" whether the physical environment of the parent's home is healthy and safe for the Child, but that it did appear that Mother had a "more stable home environment" than she had "during the course of this entire case." The evidence regarding Mother's home was sparse. Mother presented evidence in the form of photographs depicting the residence she shared with a roommate, and in the photographs the home appeared well kept and clean. Mother spoke about the photographs, explaining whether she or her roommate owned various items in the house. Upon review, we determine factor (R) to weigh neutrally regarding termination.

Factor (S) questions whether the parents have consistently provided child support,

and the trial court stated that although the parents have "paid some child support[,] Mother's payment of child support has not been consistent." We agree with the trial court. Mother related that her wages had been garnished for child support at her two previous places of employment but that she had not paid child support for the eight months leading up to the trial date and had not contacted the child support office to resume payments. Factor (S) weighs in favor of termination.

In totality, the evidence preponderates in favor of the trial court's conclusion that clear and convincing evidence established that termination of Mother's parental rights was in the Child's best interest.

## VIII.  Conclusion

For the foregoing reasons, we reverse the trial court's judgment concerning the statutory ground of failure to manifest an ability or willingness to assume legal and physical custody of or financial responsibility for the Child and determine that Petitioners established this ground by clear and convincing evidence. We affirm the trial court's judgment in all other respects, including the court's termination of Mother's parental rights. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Aliyah H.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE